Hillard DAWSON, Appellant–
Defendant,

v.

STATE of Indiana, Appellee.

No. 42A01–0211–CR–427.

Court of Appeals of Indiana.

April 16, 2003.

John Pinnow, Special Assistant to State Public Defender, Greenwood, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Ellen H. Meilaender, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

SULLIVAN, Judge.

Hillard Dawson appeals from his jury trial conviction for Dealing in a Controlled Substance as a Class B felony.[1] He presents two issues for our review, which we restate as whether evidence was seized during an illegal warrantless search of an automobile in which he had been traveling and whether the evidence was sufficient to support his conviction.

We affirm.

At approximately 11:40 p.m. on November 10, 2001, an anonymous caller informed police that there was a large, blue four-door car parked along Marchino Road in Knox county near an agricultural co-op. The caller informed police that she saw the car drop someone off and that persons were carrying containers to and from the co-op. Indiana State Police Trooper Jason

---

1. Ind.Code § 35–48–4–2(a)(1)(A) (Burns Code Ed. Supp.2002).

Allen received the dispatch and responded to the call. He located a four-door Oldsmobile parked in the road approximately one to two miles from the agricultural co-op and parked his car behind it. The hood was up, no lights were on, and the car was not running. Trooper Allen did not see anyone inside the car or in the vicinity.

After Trooper Allen got out of his car, Michael Kitchell walked from the front of the Oldsmobile and towards Trooper Allen. Hillard Dawson also walked from the front of the car into Allen's line of vision. Both individuals were ordered to place their hands on the trunk of the car. At that time, Trooper Allen saw a female, Jessie Powell, in the car and ordered her out of the vehicle. In response to Trooper Allen's question about what they were doing, Kitchell and Dawson claimed that they had run out of gas.

Indiana State Police Trooper Brett Pool arrived shortly after Trooper Allen and parked in front of the Oldsmobile. He saw one individual on the passenger side of the car approaching Trooper Allen. As Trooper Pool walked past the car, he smelled the odor of anhydrous ammonia and ether. In the backseat of the car, Trooper Pool saw tubing and coffee filters. The car[2] was subsequently searched and various items used in the manufacture of methamphetamine were found, including a plastic bag containing 26.95 grams of ephedrine[3] in a powder form and lithium batteries with the casings stripped off.[4]

Dawson was charged with dealing in a controlled substance, namely, the knowing manufacture of methamphetamine. Prior to trial, Dawson filed a motion to suppress the evidence arguing that he was subjected to an illegal investigatory stop. That motion was denied. At trial, Dawson renewed his objections to the admission of the evidence. Upon appeal, Dawson has characterized his claim as a challenge to the denial of his motion to suppress the evidence.

In order for this court to review the denial of a motion to suppress, the error must be preserved by a specific and timely objection to the evidence at trial. *Green v. State*, 753 N.E.2d 52, 59 (Ind.Ct. App.2001), *trans. denied.* The denial of a motion to suppress in and of itself is insufficient to preserve error for appeal. *Id.* Here, because Dawson objected to the admission of evidence at trial, the alleged error has been preserved.[5]

2. As later revealed, the car did not belong to any of the three individuals who were taken into custody by the Troopers that evening. The car was registered to Teresa Dorney who had dated Kitchell and had just met Powell and Dawson a few days before they were arrested. Dorney had not given anyone permission to use her car and reported it as being stolen.

3. The testimony at trial indicated that the powder was either ephedrine or pseudoephedrine. Additionally, the officers testifying at trial referred to them interchangeably as the ingredient used to manufacture methamphetamine. Finally, Indiana Code § 35–48–4–14.5 (Burns Code Ed. Supp.2002) lists both as a precursor for manufacturing. Therefore, we will refer to ephedrine as including both ephedrine and pseudoephedrine.

4. Additional items which were found in the car but are not pertinent to the decision in this case include: Dawson's identification card and a syringe in the glove box, a black bag under the front passenger seat containing syringes, razor blades, and a pill bottle with a clear liquid, and a gallon jug each of muriatic acid and camp fuel in the trunk. A plastic gas can containing anhydrous ammonia was found approximately 100 feet away from the car.

5. At trial, the parties referred the trial court to the argument from the motion to suppress hearing for the purpose of ruling on the objection to the evidence.

The admission of evidence is a matter within the sound discretion of the trial court. *Hyppolite v. State,* 774 N.E.2d 584, 592 (Ind.Ct.App.2002), *trans. denied.* The decision to admit evidence will not be reversed absent a showing of manifest abuse of discretion resulting in the denial of a fair trial. *Id.* An abuse of discretion occurs when a decision is clearly against the logic and effect of the facts and circumstances before the trial court. *Id.* In reviewing the admissibility of evidence, we consider only the evidence in favor of the trial court's ruling and any unrefuted evidence in the defendant's favor. *Id.*

Dawson contends that the Troopers did not have reasonable suspicion which would justify a stop, that the Troopers were acting solely upon an uncorroborated anonymous tip, and that the evidence found in the car was inadmissible as "fruit of the poisonous tree." The State asserts that no stop occurred because the car was parked in the middle of the road with the hood up when Trooper Allen arrived. Additionally, the State contends that even if there was a stop and Dawson was seized when he was ordered to place his hands upon the trunk of the car, that action was not improper because the Troopers had additional information which corroborated the testimony of the anonymous informant and independently created reasonable suspicion.[6]

An investigatory stop may be made when a police officer can point to reasonable and articulable facts, and inferences based upon those facts, which would warrant an intrusion upon an individual's constitutionally protected rights. *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Bovie v. State,* 760 N.E.2d 1195, 1198 (Ind.Ct.App.2002). An investigatory stop begins when an individual no longer remains free to leave the officer's presence. *Bovie,* 760 N.E.2d at 1198. When the facts known to the police officer at the time of the stop are such that a person of reasonable caution would believe that the action taken by the officer was appropriate, an investigatory stop is proper. *Id.* The requirement is satisfied when an ordinarily prudent person would conclude that criminal activity has occurred or is about to occur. *Crabtree v. State,* 762 N.E.2d 241, 246 (Ind.Ct.App. 2002).

Reasonable suspicion is determined on a case-by-case basis. *Bovie,* 760 N.E.2d at 1198. Reasonable suspicion does not require proof of wrongdoing by a preponderance of the evidence, but something more than an inchoate and unparticularized suspicion or hunch. *Crabtree,* 762 N.E.2d at 246. Consideration of the totality of the circumstances necessarily includes a consideration of whether the defendant's actions were suspicious. *Id.*

Dawson does not contend that Trooper Allen could not approach the car which was parked in the middle of the road with its hood up. Indeed, it would be disingenuous to make such an argument because part of the duties of the police is not only to enforce the criminal laws but to also aid those in distress, abate hazards,

---

6. At the motion to suppress hearing, the State argued that Dawson did not have standing to challenge the search of the car because it did not belong to him and was reported stolen the next day. The trial court did not address the issue of standing in its order denying the motion to suppress. Upon appeal, the State makes no claim in regard to whether Dawson has standing to challenge the search. There-fore, we do not address the issue of standing but examine the propriety of the search of the automobile as if Dawson would have standing to challenge the warrantless search. *See Tumblin v. State,* 736 N.E.2d 317, 321 (Ind. Ct.App.2000) (stating that in resolving a claim of an unlawful search and seizure, appellate courts should not sua sponte invoke the lack of standing), *trans. denied.*

prevent potential hazards from materializing, and perform an infinite variety of other tasks calculated to enhance and maintain the safety of the community. *Fair v. State*, 627 N.E.2d 427, 431 (Ind. 1993). However, the State's argument that no stop occurred at any time because the car was parked in the middle of the road when Trooper Allen arrived at the scene is unsupportable. It is indisputable that a stop occurred as soon as Dawson was ordered to place his hands upon the trunk of the car because his freedom of movement had been restricted. *See Crabtree*, 762 N.E.2d at 246 (holding that the defendant was subjected to an investigatory stop when he was ordered to "get [his] hands up" by an officer).

The parties disagree as to whether there was reasonable suspicion for the stop and focus upon the possibility of criminal activity as the basis for their respective arguments. The crucial element to distinguishing their arguments is based upon the timing of when reasonable suspicion was acquired and whether the stop had actually occurred prior to the officers gaining reasonable suspicion.

■ Turning to Dawson's first argument, we agree that an anonymous tip, standing alone, which is not confirmed in significant aspects, may not constitute reasonable suspicion. *Id.* The State counters that the tip was corroborated when Trooper Pool smelled anhydrous ammonia as he walked by the car. Moreover, the State asserts that the facts known to the Troopers at the time of the stop created reasonable suspicion independent of the anonymous tip.

Based upon a review of the evidence, we conclude that the Troopers had reasonable suspicion which supported the investigatory stop. Here, Trooper Allen was searching an area based upon an anonymous tip that individuals in a large, blue four-door car were seen in proximity to the co-op carrying containers. Trooper Allen located that vehicle parked in the middle of the road with its hood up. The engine was not running and no lights were on even though it was after 11:40 p.m. Trooper Allen did not see anyone either in the car or standing around it. He radioed in his location, activated his emergency lights, and exited his vehicle. At that time, two male individuals walked around opposite sides of the car. Trooper Pool also arrived at this time and saw an individual on the passenger side of the car. As Trooper Pool walked past the car in order to assist Trooper Allen, he smelled anhydrous ammonia. As Trooper Pool testified at trial, the individuals were ordered to put their hands on the trunk of the car for officer safety purposes so that they could do a pat-down search.[7] Based upon the suspicious nature of the car being parked in the middle of the road in a secluded area a short distance from an agricultural co-op, an anonymous tip that individuals were seen carrying containers to and from the co-op, the sudden appearance of three individuals after Trooper Allen exited his vehicle, and the odor of anhydrous ammonia which was detected by Trooper Pool, an ordinarily prudent person might reasonably conclude that criminal activity had occurred. Because the Troopers had reasonable suspicion to support the stop, the

---

7. We recognize, as Dawson points out in his reply brief, that Trooper Allen testified that he ordered the two male individuals to put their hands on the trunk before Trooper Pool arrived. However, Trooper Pool testified otherwise. At trial, Trooper Pool testified that he smelled anhydrous ammonia and ether as he walked past the Oldsmobile on his way to the back of the car to assist Trooper Allen. According to Trooper Pool, he and Trooper Allen then ordered the individuals to place their hands on the trunk of the car for officer safety purposes.

trial court did not err in allowing into evidence the items recovered during the search of the car.

 Dawson also contends that the evidence was insufficient to support the conviction for manufacturing methamphetamine. Dawson asserts that the process of manufacturing had not yet begun at the time that he was subject to the investigatory stop and subsequent arrest. He concedes that the evidence is sufficient to show that he possessed the precursors. Additionally, he claims that if we were to hold that he was in the process of manufacturing methamphetamine, the crime of possession of precursors would be "swallowed up" by the crime of dealing in a controlled substance. Appellant's Brief at 14.

 When reviewing a claim of insufficient evidence, we neither reweigh evidence nor judge the credibility of witnesses. *Lycan v. State,* 671 N.E.2d 447, 456 (Ind.Ct.App.1996). We consider only the evidence which is favorable to the judgment along with the reasonable inferences to be drawn therefrom to determine whether there was sufficient evidence of probative value to support a conviction. *Id.*

Indiana Code § 35–48–4–2 states that anyone who knowingly or intentionally manufactures a controlled substance which is classified in schedule I, II, or III commits dealing in a controlled substance.[8] Indiana Code § 35–48–1–18 (Burns Code Ed. Supp.2002) defines "manufacture" as: "the production, preparation, propagation, compounding, conversion, or processing of a controlled substance, either directly or indirectly by extraction from substances of natural origin, independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis, and includes any packaging or repackaging of the substance or labeling or relabeling of its container."

In *Bush v. State,* 772 N.E.2d 1020, 1023 (Ind.Ct.App.2002), *trans. denied,* we concluded that I.C. § 35–48–4–2 does not require that the manufacturing process be completed or that there be actual product before someone could be found to have manufactured a controlled substance. The same day that we decided *Bush,* we also discussed the practical differences between I.C. § 35–48–4–2 and I.C. § 35–48–4–14.5(b) (Burns Code Ed. Supp.2002) in *Iddings v. State,* 772 N.E.2d 1006 (Ind.Ct. App.2002), *trans. denied.* Indiana Code § 35–48–4–14.5 prohibits the possession of two or more listed precursors when those precursors are possessed with the intent to manufacture methamphetamine. As we determined in *Iddings,* the sole difference in those two offenses is "that one may be guilty of possessing chemical precursors with intent to manufacture without actually beginning the manufacturing process, whereas the manufacturing process must, at the very least, have been started by a defendant in order to be found guilty of manufacturing methamphetamine." 772 N.E.2d at 1016–17. It is this last distinction which Dawson claims was not met in this case, thereby invalidating his conviction.

Sergeant Paul Andry of the Indiana State Police described the methamphetamine manufacturing process at trial. He testified that the first step in the manufacturing of methamphetamine is the extraction of ephedrine from tablets which contain those substances. In so testifying, he noted that it is standard practice for individuals to crush up the pills which contain

---

**8.** Methamphetamine is a schedule II controlled substance as listed in Ind.Code § 35–48–2–6 (Burns Code Ed. Repl.1998).

ephedrine before soaking them in denatured alcohol so that the ephedrine can be extracted from the pill binders. In this case, the jury was presented with evidence that a bag containing a white powder which tested positive for ephedrine was found in the car. This fact is not disputed by Dawson; however, he claims that having the crushed up pills does not equate to the start of the manufacturing process. Rather, he claims that manufacturing does not begin until some of the precursors have been combined.

Reviewing the definition of manufacturing quoted above, we conclude that once an individual crushes up pills in order to separate the ephedrine from the pill binders, the manufacturing process has begun. Focusing upon the key phrases in the definition in making this determination, we observe that "manufacture" is the "production, preparation, ... or processing of a controlled substance ... by extraction from substances of natural origin...." I.C. § 35–48–1–18. As Sergeant Andry explained, in the manufacturing method which was being utilized by Dawson, the main ingredient is ephedrine and it is the substance which is chemically converted into methamphetamine. The crushing of the pills into a powder form indicates that not only did Dawson possess the precursor ephedrine, but that he also began the extraction process. This sufficiently meets the definition of manufacturing in order to support a conviction for dealing in methamphetamine by knowingly manufacturing it.

The judgment of the trial court is affirmed.

SHARPNACK and KIRSCH, JJ., concur.