**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANTS:

**RENEE J. MORTIMER**
**SCOTT B. COCKRUM**
Hinshaw & Culbertson LLP
Schererville, Indiana

ATTORNEY FOR APPELLEES:

**ADAM J. SEDIA**
Rubino, Ruman, Crosmer & Polen
Dyer, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| KARL KAPANKE, UNIVERSAL AM-CAN, LTD., and M.C. SCHMITT TRUCKING, INC., | ) ) ) | |
| Appellants-Defendants, | ) ) | |
| vs. | ) ) | No. 45A03-1201-CT-12 |
| JAMES STOVALL and TRACY STOVALL, | ) ) ) | |
| Appellees-Plaintiffs. | ) ) | |

APPEAL FROM THE LAKE SUPERIOR COURT
The Honorable Diane Kavadias-Schneider, Judge
Cause No. 45D01-0808-CT-54

**December 26, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**NAJAM, Judge**

**STATEMENT OF THE CASE**

Karl Kapanke, Universal Am-Can Ltd. ("UACL"), and M.C. Schmitt Trucking, Inc. ("M.C. Schmitt") (collectively, "the Trucking Company") appeal the judgment for James Stovall and Tracy Stovall on the Stovalls' claims of negligence and loss of consortium following a jury trial. The Trucking Company raises four issues for our review, which we restate as the following two issues:

1. Whether the trial court abused its discretion when it prohibited the Trucking Company from admitting certain evidence into the record; and

2. Whether the trial court abused its discretion when it permitted the Stovalls to argue punitive damages to the jury.

We affirm.

**FACTS AND PROCEDURAL HISTORY**

On April 11, 2000, James went to the Munster Community Hospital and met with Dr. Pravin Gupta. James complained of "almost blacking out and felt like heart fluttering while driving this AM at 0530," "chest discomfort," and being "light-headed." Appellants' App. at 40. Dr. Gupta did not associate James' complaints or symptoms with "any type of seizure disorder." Id. at 41. Three days later, James was taken to Morris Hospital in Illinois by ambulance after he had been struck by a door in the side of his head at a work site, pushing his safety glasses into his left eye. An unsigned triage report from Morris Hospital stated that James "ha[d] been taking Lipitor until last Tuesday [April 11], had seizure-like activity on Tuesday." Id. at 42.

More than seven years later, on the morning of November 14, 2007, James was driving north on Cline Avenue in Gary. Kapanke was driving his semi-trailer directly

2

behind James. At the time, M.C. Schmitt employed Kapanke, and he was working as a leased driver to UACL.

James approached stopped traffic in front of him and brought his vehicle to a stop. Kapanke did not stop and rear-ended James' vehicle, pushing it into the vehicle in front of James and totaling James' vehicle. James was taken to the emergency room at St. Catherine's Hospital in East Chicago, where he complained that something had "hit him in the head." Appellees' App. at 363.[1] James was dismissed from the hospital later that day and instructed to see his regular doctor, Dr. Brechner.[2] James did so, and Dr. Brechner referred him to Dr. Richard Cristea, a neurologist.

James saw Dr. Cristea on December 5, 2007. Based on Dr. Cristea's examination of James and review of James' medical history, Dr. Cristea diagnosed James as having traumatic brain injury ("TBI") with cognitive issues and compulsions, namely, being agitated and asking the same questions repeatedly. Dr. Cristea also diagnosed James with lumbar spine pain with muscle involvement and vestibulopathy, or a change in balance that causes dizziness. Dr. Cristea based his diagnosis of TBI in part on his objective findings that James had nystagmus to the right lateral gaze, decreased vibration sensation, and increased reflex in the knees. Dr. Cristea further noted that James' emergency room records from November 14 "confirm[ed the TBI] diagnosis" based on James "asking [the] same questions over and over." Id. at 93.

---

[1] We appreciate the parties' reproduction of relevant portions of the voluminous transcript in their appendices.

[2] Dr. Brechner's first name is not in the record.

Dr. Cristea referred James to Dr. Laatsch,[3] a TBI rehabilitation psychologist at the University of Illinois. James met with Dr. Laatsch thereafter, and Dr. Laatsch sent a report back to Dr. Cristea. According to Dr. Laatsch, "[n]ot only did [James] have some cognitive issues, but he had all the psychological issues associated with [TBI], depression, anxiety, and then the pain issues as well." Id. at 96-97. Dr. Laatsch recommended that James participate in cognitive rehabilitation, which he did.

In March of 2009, James complained to Dr. Cristea of dizziness and balance issues, and Dr. Cristea referred him to Dr. Lonnie Amico, a neurologist at the Neurological Institute and Specialty Center who treated epileptic patients. Thereafter, on April 21, James was admitted to the ICU at St. Anthony's Hospital in Crown Point. Dr. Amico's partner, Dr. Louis Teodori, treated James and observed James having seizures, which Dr. Teodori believed to be psychogenic.[4] Dr. Teodori had James moved to the epileptic monitoring unit of the hospital where he would be under Dr. Amico's care. On April 25, Dr. Amico observed James "posturing in the bed and thrashing." Id. at 220. Dr. Amico was initially unsure whether James' seizures were psychogenic or epileptic, but, based on subsequent treatment, Dr. Amico later concluded that there was "a high probability" that James had frontal lobe epilepsy or focal epilepsy.[5] Id. at 230. Based on James' medical history, Dr. Amico opined that the November 14 accident had caused James' seizures.

---

[3] Dr. Laatsch's first name is not in the record.

[4] Unlike epileptic seizures, psychogenic seizures are psychological in origin rather than physical.

[5] These terms appear interchangeable based on Dr. Amico's testimony.

4

Dr. Amico referred James to Dr. Nancy Foldvary-Schaefer, a neurologist at the Cleveland Clinic specializing in epilepsy. Dr. Foldvary-Schaefer conducted a "comprehensive evaluation" of James throughout 2009 and 2010 "to clarify the nature of his seizures." Id. at 174. She concluded that he suffered from focal epilepsy as a result of the November 14 accident. She further stated that James' focal epilepsy was a permanent injury.

On April 18, 2008, the Stovalls filed suit against the Trucking Company alleging, in pertinent part, negligence in the hiring, supervising, training, and retention of Kapanke. The Stovalls later amended their complaint, further alleging that the Trucking Company had committed willful and wanton misconduct in the hiring, supervising, training, retention, and entrustment of the semi-trailer to Kapanke. The Stovalls requested relief in the form of "compensatory damages . . . and any other proper relief." Appellants' App. at 37.

At the ensuing trial, Drs. Cristea, Amico, and Foldvary-Schaefer all testified on behalf of the Stovalls. Specifically, each of those doctors testified that, based on their medical opinions, James' seizures were based on a permanent, physical injury that occurred on November 14, 2007.

The Trucking Company called Dr. Elizabeth Kessler, a neurologist; Linda Dispenza, a registered nurse who had observed at least one of James' seizures at St. Anthony's Hospital; and Dr. J. Preston Harley, a neuropsychologist. Dr. Kessler opined that there was "no evidence" to support Dr. Cristea's diagnosis of TBI or Dr. Amico's and Dr. Foldvary-Schafer's diagnoses of frontal lobe epilepsy. Appellees' App. at 394-

5

96. On cross-examination of Dr. Kessler, the Stovalls asked her if James had "this kind of behavior before the accident." Appellants' App. at 281. Dr. Kessler stated that he had, and the Trucking Company then sought to have admitted into evidence James' April 11, 2000, and April 14, 2000, medical records as proposed Exhibits 4 and 5, respectively. After an offer of proof, the trial court denied the Trucking Company's request to have Exhibits 4 and 5 admitted on the ground that those records did not demonstrate "a history of seizures" and that the documents' relevancy was substantially outweighed by "the likelihood of misleading or prejudicing the jury in understanding the event." Id. at 296-97.

The Trucking Company also called Nurse Dispenza. Nurse Dispenza testified that she observed at least one of James' seizures at St. Anthony's Hospital. During her testimony, Nurse Dispenza stated that she had treated "close to a thousand" patients "who had a seizure disorder." Appellees' App. at 419. Nurse Dispenza then described the conditions she normally observes in patients having seizures and her observations of James during his seizures:

> Q Did [James] ever have a seizure when someone was not in the room with him?
>
> A I don't recall.
>
>     * * *
>
> Q In the thousands of patients in whose care you've participated before [James], did you observe that they had any vital sign changes when they had a seizure?
>
>     * * *

6

[A]     Most of the time there is an increase in the heart rate and respirations. And sometimes . . . you'll see a pattern, you know, shaking from that, not always, but . . .

Q       Did you ever observe any vital sign changes that [James] had when he was having a seizure?

A       I never noticed any increase in heart rate or respirations when he was having his seizures.

Q       Did you ever notice whether [James] was wiped out . . . after having a seizure?

A       I don't recall any time.

                                  * * *

Q       Ms. Dispenza, of the thousands of patients you treated with a seizure disorder prior to [James], did you ever observe that those patients spoke during their seizures?

A       I don't recall any.

Q       When you participated in the care of [James], did he speak during his seizures?

A       There w[ere] a few occasions, yes.

Id. at 416-19. The Trucking Company then requested a sidebar and asked the court to allow it to ask Nurse Dispenza to opine on whether James had suffered seizures, despite the court's earlier ruling on a motion in limine prohibiting the Trucking Company from doing so. The court refused to allow the Trucking Company to ask Nurse Dispenza that question, stating that "[s]he's not qualified to give that opinion." Id. at 420.

Dr. Harley testified that he had a doctorate in psychology and he specialized in neuropsychology. He further stated that he had taken "medical courses in neurology, neuroanatomy, neurochemistry, [and] neuropathy," although he "didn't take them for

7

credit because [he] wasn't seeking a medical degree." Appellants' App. at 325. The Trucking Company asked Dr. Harley the following question: "Have you reached an opinion in this case, as a neuropsychologist based upon the testing you've done [o]n [James], and all the other information you have available to you, as to whether or not [James] showed any evidence of [TBI]?" Id. at 336-37. The Stovalls objected to the question on the basis of Dr. Harley's educational foundation. The trial court sustained the objection, stating that "this is too much." Id. at 338.

Nonetheless, during Dr. Harley's immediately ensuing testimony, Dr. Harley stated the following conclusions:

Q    Okay. I want to ask you some questions about opinions you've reached in this case.

A    Yes, sir.

Q    . . . First of all, do you have an opinion as to whether or not [James] demonstrated any intact cognitive functioning, based upon your interview and testing of him?

A    Yes.

Q    And what's your opinion?

A    That essentially his cognition is intact.

Q    All right. Did you have any opinion as to whether or not his self-report measures . . . were usual, unusual, or associated in any way with reporting of somatic or cognitive symptoms?

A    Yes.

Q    And what opinions did you reach in that regard?

A    . . . on the self-report measures that we gave him . . . his level of infrequent responding is uncommon, and even in individuals with genuine[,] sever[e] psychological difficulties who report credible

8

symptoms. So he's saying things that we just usually don't see in a typical . . . population as well as atypical populations of individuals who have brain injuries.

Q       Did you reach any opinion based upon what you've done in this case, and based upon your experience, and the literature that exists in terms of studying this topic as to whether or not there's a possibility that [James] exhibited any . . . malingering?

\* \* \*

A       It's my opinion that his profile is not compatible with a typical clinical profile that we would see in a[n] individual who has sustained a [TBI], but rather is typical and indicative of an individual who over-reports a whole . . . host of symptoms.

\* \* \*

A       Malingering is a very strong word, and I would say that—I would prefer to say that his profile is . . . not reasonable for any individual who's had a brain injury. It's more reasonable with an individual who has psychological issues.

Id. at 341-44.

Following the conclusion of the trial, the jury returned a verdict for the Stovalls. The jury awarded James $6,244,983 in compensatory damages and $0 in punitive damages. The jury also awarded Tracy $1,500,000 in compensatory damages. The court entered judgment on the verdict from the bench and denied the Trucking Company's ensuing motion to correct error. This appeal ensued.

9

## DISCUSSION AND DECISION

### Issue One:  Admission of Evidence

On appeal, the Trucking Company contends that the trial court erred in the exclusion of evidence.[6]  Our standard of review of a trial court's admission or exclusion of evidence is an abuse of discretion.  Speybroeck v. State, 875 N.E.2d 813, 818 (Ind. Ct. App. 2007).  A trial court abuses its discretion only if its decision is clearly against the logic and effect of the facts and circumstances before the court.  Id.  In reviewing the admissibility of evidence, we consider only the evidence in favor of the trial court's ruling and any unrefuted evidence in the defendants' favor.  Dawson v. State, 786 N.E.2d 742, 745 (Ind. Ct. App. 2003), trans. denied.

> And not all error is reversible error.  As our supreme court has explained:
>
> errors in the admission of evidence are to be disregarded as harmless error unless they affect the substantial rights of a party.  Likewise, reversible error cannot be predicated upon the erroneous admission of evidence that is merely cumulative of other evidence that has already been properly admitted.  To determine whether the admission of evidence affected a party's substantial rights, we assess the probable impact of the evidence upon the jury.

Sibbing v. Cave, 922 N.E.2d 594, 598 (Ind. 2010) (quotations and citations omitted).

The Trucking Company asserts that the court committed three substantial errors in ruling on the admissibility of the evidence.  Namely, the Trucking Company asserts that the court erred when it (1) "prevent[ed the Trucking Company] from presenting any

---

[6] The Trucking Company also complains about the court's related orders on the various motions in limine, but a motion in limine is not a final ruling on the admissibility of evidence, and a ruling on the motion does not preserve the error for appeal.  See Simmons v. State, 760 N.E.2d 1154, 1158 (Ind. Ct. App. 2002).  Rather, "[i]n order to preserve error in the overruling of a pre-trial motion in limine, the appealing party must object to the admission of the evidence at the time it is offered."  Id.  Insofar as the Trucking Company preserved its arguments by objecting during trial, we consider them in that context.

evidence of [James'] pre-existing seizures or spells," Appellants' Br. at 14; (2) "excluded Nurse Linda Dispenza's observations and impressions about the odd nature of [James'] seizures after the motor vehicle accident," id. at 15; and (3) refused to allow Dr. Harley to "render a medical/neuropsychological diagnosis," id. at 16. We address each of the Trucking Company's arguments in turn.

### The April 2000 Medical Records

The Trucking Company first asserts that the trial court abused its discretion when it excluded James' April 2000 medical records. The trial court excluded those records under Indiana Evidence Rule 403, which provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." We agree with the trial court's decision.

The probative value, if any, of the April 2000 medical records was minimal. In reviewing his April 11, 2000, report during his deposition, Dr. Gupta expressly testified that James' complaints and symptoms from that visit were not "evidence of any type of a seizure disorder." Appellants' App. at 41. Insofar as either of the April 2000 reports indicated to the contrary, Dr. Gupta's testimony unambiguously clarified that James' April 11, 2000, symptoms did not have the probative value claimed by the Trucking Company.

On the other hand, the danger of unfair prejudice, confusion of the issues, or misleading the jury from the April 2000 medical records was substantial. The April 14, 2000, report is not signed by anyone yet refers ambiguously to "seizure-like activity"

11

from April 11. Id. at 42. This isolated comment from an unknown person more than seven years before the November 2007 automobile accident is unsubstantiated, uncorroborated, and remote in time from the events the jury was asked to consider.

Further, the facts in the case law cited by the Trucking Company are inapposite to this case. In particular, the Trucking Company asserts that Reliable Development Corp. v. Berrier, 851 N.E.2d 983 (Ind. Ct. App. 2006), is "controlling." Appellants' Br. at 22. We cannot agree. In that case, the plaintiff claimed to have injured his lower back when he was running on the defendant's treadmill and the machine came to a sudden stop. The trial court excluded the defendant's attempt to introduce into evidence the plaintiff's nearly ten-year history of back injuries and pain. We reversed. Berrier, 851 N.E.2d at 989-90. However, we cautioned that evidence of a person's medical history that does not show "a logical nexus or causal relationship between the injury sued on and the unrelated injury or condition . . . may be excluded." Id. at 988-89.

Here, in light of Dr. Gupta's deposition testimony that the April 11, 2000, medical report was not evidence of any type of seizure, the Trucking Company cannot demonstrate that that medical record—or the April 14, 2000, record that purports to describe what happened on April 11—had a logical nexus or causal relationship to James' November 14, 2007, injuries. Accordingly, we cannot say that the trial court erred when it concluded that the probative value, if any, of the April 2000 medical records was substantially outweighed by the danger of unfair prejudice, confusion of the

issues, or misleading the jury.  See Ind. Evidence Rule 403.  We affirm the trial court's exclusion of those records.[7]

## Nurse Dispenza's Testimony

The Trucking Company next asserts that the trial court abused its discretion when it refused to allow Nurse Dispenza to state her opinion on James' condition based on her observations.  In particular, the Trucking Company sought to have Nurse Dispenza testify that James' behavior during a seizure she had observed was "odd," thereby implying that James was faking his symptoms.  See Appellants' Br. at 30.

We need not discuss whether Indiana law permits registered nurses to give medical opinions because any error in the court's exclusion of this part of Nurse Dispenza's testimony was harmless.  As detailed above, Nurse Dispenza's testimony included the conditions she normally observes in patients having seizures and that James did not exhibit many of those conditions during the seizures she observed.  The reasonable inference from her testimony was that James' seizure was not consistent with Nurse Dispenza's extensive experience with seizure patients.  The probable impact on the jury of the excluded portion of her testimony is insignificant and, therefore, harmless.[8] See Sibbing, 922 N.E.2d at 598.

---

[7] For the same reasons, we do not consider the Trucking Company's assertion that it should have been permitted to introduce the April 2000 medical records while cross-examining the Stovalls' witnesses or that reversal is required in the interests of substantial justice.  Further, insofar as the Trucking Company also asserts that the trial court's errors in the admission of evidence were pervasive or cumulative, we note that that argument is predicated on the admissibility of the April 2000 medical records.  Because the trial court properly excluded those records, we need not consider the Trucking Company's additional argument.

[8] For the same reason, the trial court did not commit reversible error when it refused to allow the Trucking Company to introduce this evidence in response to the Stovalls' examination of Nurse Dispenza.  See Appellants' Br. at 32.

13

Dr. Harley's Testimony

Finally, the Trucking Company contends that the trial court erred when it refused to allow Dr. Harley to render a medical diagnosis for James. As with Nurse Dispenza's excluded testimony, the trial court's exclusion of this portion of Dr. Harley's testimony is harmless error, if any error.[9]

Dr. Harley testified that James' cognitive functioning was intact after the collision, that James' psychological profile was inconsistent with someone who suffers from a brain injury, and that James, in essence, faked his self-reporting responses. Further, Dr. Kessler opined that there was "no evidence" to support the diagnosis of either TBI or frontal lobe epilepsy resulting from the collision, which is the same conclusion the Trucking Company sought to have Dr. Harley state to the jury. Appellees' App. at 394. Thus, the probable impact of the excluded portions of Dr. Harley's testimony on the jury was minimal and, as such, harmless. See Sibbing, 922 N.E.2d at 598.

**Issue Two:  Punitive Damages**

Finally, the Trucking Company argues that the trial court erred for multiple reasons when it permitted the Stovalls to request punitive damages from the jury. We need not address these arguments. The jury awarded the Stovalls zero dollars in punitive damages. Thus, any error by the trial court in permitting the Stovalls to argue punitive damages to the jury is harmless. See, e.g., Handrow v. Cox, 575 N.E.2d 611, 613 n.1 (Ind. 1991) (holding that, while it was error to allow the jury to consider the percent fault

---

[9] We acknowledge the holding in Bennett v. Richmond, 960 N.E.2d 782, 791 (Ind. 2012), in which our supreme court concluded that a psychologist was qualified to offer his opinion as to the cause of the plaintiff's brain injury. But the specific question here is whether the exclusion of Dr. Harley's testimony affected the outcome. Thus, we need not decide whether the trial court erred in not following Bennett.

of a dismissed party, that error was harmless in light of the jury's assessment of zero percent fault to that party); Ridgeway v. Teshoian, 699 N.E.2d 1156, 1161 n.3 (Ind. Ct. App. 1998) (noting that any error in the trial court's entry of judgment for the defendant was harmless in light of the jury's award of zero damages for the plaintiff).

Further, the Trucking Company's assertion that the Stovalls' arguments on punitive damages caused the jury to enter an award for compensatory damages that was higher than justified is pure speculation, which we will not consider. The compensation awarded by the jury was within the evidence before it—a fact the Trucking Company does not dispute—and we will not reweigh the evidence underlying that award.

### CONCLUSION

In sum, the trial court did not abuse its discretion in the exclusion of the April 2000 medical records, and any error by the trial court in limiting the testimony of Nurse Dispenza or Dr. Harley was harmless. Likewise, any error by the trial court in permitting the Stovalls to argue punitive damages to the jury is harmless in light of the jury's award of zero dollars for punitive damages. Thus, we affirm the trial court's judgment.

Affirmed.

FRIEDLANDER, J., and BRADFORD, J., concur.

15