**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Aug 28 2014, 9:15 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**PATRICIA CARESS MCMATH**
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**LARRY D. ALLEN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| RYAN WORLINE, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 49A02-1312-CR-1041 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Lisa F. Borges, Judge
Cause No. 49G04-1303-MR-020499

**August 28, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**SHARPNACK, Senior Judge**

Ryan Worline appeals from his conviction and sentence for Murder,[1] contending that there were evidentiary errors necessitating a reversal of his conviction, and that sentencing errors were made. We affirm.

ISSUES

Worline presents the following issues for our review:

I.  Whether the trial court abused its discretion by admitting irrelevant and prejudicial evidence of bad character.

II. Whether the trial court abused its discretion by finding aggravating circumstances not supported by the evidence.

III. Whether Worline's sentence is inappropriate in light of the nature of the offense and the character of the offender.

FACTS AND PROCEDURAL HISTORY

In January 2012, Worline lived with his girlfriend, Chelsea Taylor, her thirteen-month-old son, Jayden, and Worline's almost two-year-old daughter, A.W., from a previous relationship, at the Lakeshore Apartments. On January 17, 2012, Jayden's father, Jerraco Noel, met Taylor and Jayden at the clubhouse of the apartment complex for a regularly scheduled visit shortly after 10:00 a.m. Noel noticed that Jayden seemed sick and appeared to be tired. He observed no visible injuries on Jayden except for some mucus in Jayden's nose and a scratch on his forehead. Later during the course of the visit, Worline and A.W. were in an adjacent room in the clubhouse. As Noel was preparing to leave, Worline called Noel a deadbeat. Noel returned Jayden to Taylor's care and told her that

---

[1] Indiana Code § 35-42-1-1 (2007).

he did not want Worline to be present at any future visitations. When Noel was driving away from the apartment complex, he received a telephone call from Worline, during which the two argued and exchanged threats.

That same day, Taylor left for work at approximately 4:30 p.m., leaving Worline to care for Jayden and A.W. Later that evening, Worline's neighbors heard what sounded like an altercation and a loud thumping coming from Worline's apartment between 7:00 p.m. and 9:00 p.m. One of Worline's neighbors heard a baby crying when she returned home from between 7:30 p.m. and 8:00 p.m. A neighbor who lived in the apartment directly below Worline's apartment hit the ceiling with a frying pan to make the thumping noise stop. She also described the sound as being similar to free weights being dropped. She then went upstairs to knock on Worline's door. Prior to going upstairs, she had looked out her window to determine if Worline or Taylor, her neighbors directly upstairs, were home. She knew which cars belonged to the two and observed that only Worline's car was parked outside.

After the neighbor knocked on the door she heard what sounded like a child's hand slap on the front door at approximately her knee level. A male voice inside the apartment whispered, "Come here." Tr. p. 462. No one opened the door. The neighbor returned to her apartment after which the noise began again.

Taylor came home from work at approximately 10:00 p.m. on January 17, 2012, and found Worline lying in bed with A.W. Jayden was in his crib in another room and appeared to her to be asleep. The next morning two of Worline's neighbors saw him talking to another man at his apartment door. Worline's appearance at that time was described as

3

calm with a "cold controlling demeanor." *Id*. at 424.

Worline placed a call to 911 at approximately noon on January 18, 2012. When police officers arrived at the apartment they found Worline attempting to perform CPR on Jayden in the middle of the living room floor. Jayden's injuries, which were extensive, were immediately apparent to the responding officers. Jayden had numerous bruises and abrasions all over his body, including on his shoulder, arms, legs, and back. There were several abrasions on Jayden's head and he had a skull fracture.

After the officers arrived, they observed that Taylor appeared visibly upset, while Worline remained "stone-faced" and emotionless. *Id*. at 45. Jayden was pronounced dead at the scene by medical personnel. Investigators found a bloody towel in Worline's washing machine, and subsequent testing revealed that the DNA from the blood on the towel matched Jayden's DNA. Investigators also seized other evidence including a baseball bat, a hammer, and Worline's cell phone.

The autopsy performed at the Marion County Coroner's Office reflected that Jayden had died from blunt force trauma to the head. In addition to the abrasions and injuries initially observed, Jayden had abrasions to his pelvic area. The abrasions to Jayden's head were likely caused at the same time, but were distinct from Jayden's skull fracture. The coroner estimated that Jayden had been dead for up to twelve hours before the 911 call, and could have lived from between four and twelve hours after the injuries were inflicted. Jayden had several hemorrhages in his eyes, surrounding his ocular nerves, and around the nerve roots in his neck. The coroner also found evidence of brain swelling and subdural hemorrhaging around the brain.

Both Worline and Taylor were interviewed by police officers. In her interview, Taylor claimed that she had not noticed any injuries on Jayden and that he seemed to be breathing while in his crib when she had come home on January 17, 2012 at approximately 10:00 p.m. She further stated that she fell asleep on the couch, awaking at 5:30 a.m. on the morning of January 18, 2012, to go to school, but instead of going to school went to bed with Worline.

Worline's interview was recorded and he waived his Miranda[2] rights during his interview. Worline stated that he had made dinner for A.W. and Jayden on January 17, 2012, and that they had all watched a movie together. When asked to account for all of the events leading up to Jayden's death, including events that happened on January 17, 2012, Worline never mentioned any noises and did not recount an activity that would have explained the noises heard by others on January 17, 2012. Worline claimed that Jayden had no injuries and could not think of a reason explaining why Jayden would have sustained injuries. He stated that it was not possible for A.W. to have inflicted the injuries on Jayden, and that Taylor would never have done so. Worline had injuries to his knuckles, which were red and scabbed. When asked to explain for those injuries, Worline claimed that he had injured his hand with a door, and had aggravated that injury by placing his hands in his pockets.

The State charged Worline with Murder and neglect of a dependent resulting in death, a Class A felony. Prior to trial, Worline moved to suppress evidence of text

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

messages he had sent to Taylor in the month leading up to Jayden's death. The trial court postponed ruling on the motion to suppress until the trial court had heard the context of the evidence at trial. The trial court did warn the State, however, that the messages might be too remote in time to be admissible. The trial court admitted the text messages over objection. At the conclusion of the trial, the jury found Worline guilty of murder and neglect of a dependent resulting in death. The trial court sentenced Worline to sixty-five years in the Indiana Department of Correction with ten years suspended and five years on probation on the murder conviction and did not enter a sentence on the conviction for neglect of a dependent resulting in death, citing double jeopardy concerns. Worline now appeals. Additional facts will be supplied as needed.

## DISCUSSION AND DECISION

## I. ADMISSIBILITY OF EVIDENCE

Worline argues that the trial court abused its discretion by admitting text messages he sent to Taylor, a picture in which he is mocking Jayden, and testimony about his argument with Noel, Jayden's father, contending that the evidence was irrelevant to the murder charge and was offered only to show Worline's bad character. "The decision to admit or exclude evidence at trial is squarely within a trial court's discretion and we afford it great deference on appeal." *VanPatten v. State*, 986 N.E.2d 255, 260 (Ind. 2013) (citing *Carpenter v. State*, 786 N.E.2d 696, 702 (Ind. 2003)). We will not disturb the trial court's decision "unless it is clearly contrary to the logic and effect of the facts and circumstances of the case or misinterprets the law." *Id.* "In reviewing the admissibility of evidence, we consider only the evidence in favor of the trial court's ruling and any unrefuted evidence

6

in the defendant's favor." *Dawson v. State*, 786 N.E.2d 742, 745 (Ind. Ct. App. 2003), *trans. denied*. On review we will not reverse the trial court's decision to admit evidence if that decision is sustainable on any ground. *Crawford v. State*, 770 N.E.2d 775, 780 (Ind. 2002).

With respect to all of the challenged evidence Worline contends that it is irrelevant and was unduly prejudicial to him because it was offered to show his bad character. Indiana Evidence Rule 404(b) provides as follows:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pre-trial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Our Supreme Court has stated as follows about the goal of Evidence Rule 404(b):

> Rule 404(b) "is designed to prevent the jury from making the 'forbidden inference' that prior wrongful conduct suggests present guilt." *Byers v. State*, 709 N.E.2d 1024, 1026-27 (Ind. 1999); *see also Bassett v. State*, 795 N.E.2d 1050, 1053 (Ind. 2003) (noting the purpose behind Rule 404(b) is to "prevent[ ] the State from punishing people for their character, and evidence of extrinsic offenses poses the danger that the jury will convict the defendant because . . . he has a tendency to commit other crimes") (internal quotation omitted). "In assessing the admissibility of 404(b) evidence [the] trial court must: (1) determine that the evidence of other crimes, wrongs, or acts is relevant to a matter at issue other than the defendant's propensity to commit the charged act and (2) balance the probative value of the evidence against its prejudicial effect pursuant to Rule 403." *Wilson v. State*, 765 N.E.2d 1265, 1270 (Ind. 2002) (quotation omitted).

*Halliburton v. State*, 1 N.E.3d 670, 681-82 (Ind. 2013). "[A]ll relevant evidence is 'inherently prejudicial' in a criminal prosecution, so the inquiry boils down to a balance of

probative value against the likely unfair prejudicial impact the evidence may have on the jury." *Richmond v. State*, 685 N.E.2d 54, 55-56 (Ind. 1997) (internal quotation omitted).

Worline claims that the trial court abused its discretion by admitting text messages from him to Taylor because they were not properly authenticated. We recently addressed the admissibility of text messages in *Pavlovich v. State*, 6 N.E.3d 969 (Ind. Ct. App. 2014), *trans. denied*.

> "To lay a foundation for the admission of evidence, the proponent of the evidence must show that it has been authenticated." *Hape v. State*, 903 N.E.2d 977, 989 (Ind. Ct. App. 2009), *trans. denied*. This authentication requirement applies to the substantive content of text messages purported to be sent by a party. *See id*. Under Indiana Evidence Rule 901(a) as it existed at the time of Pavlovich's trial, authentication of evidence was "satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." "Absolute proof of authenticity is not required." *Fry v. State*, 885 N.E.2d 742, 748 (Ind. Ct. App. 2008), *trans. denied*. The proponent of the evidence needs to establish only a reasonable probability that the document is what it is claimed to be. *Id*. Once this reasonable probability is shown, any inconclusiveness regarding the exhibit's connection with the events at issue goes to the exhibit's weight, not its admissibility. *Id*. Additionally, authentication of an exhibit can be established by either direct or circumstantial evidence. *Newman v. State*, 675 N.E.2d 1109, 1111 (Ind. Ct. App. 1996).

6 N.E.3d at 976.

Additionally, we stated as follows in *Hape v. State*, 903 N.E.2d 977, 990 (Ind. Ct. App. 2009), *trans. denied*:

> Before the cellular telephones were admitted into evidence, a police officer testified about how the items seized from Hape, which included the telephones, were catalogued and tracked. Tr. p. 232-33, 236. The officer identified the exhibit on the record, *id*. at 239, and testified that he had personally initialed the seals across the top and side of the bag. *Id*. at 239-40. The State presented sufficient evidence to authenticate that the cellular telephones were the telephones retrieved from Hape, and their admission into evidence did not constitute error.

8

Here, the State presented testimony about how Worline's cell phone, an Apple iPhone, was seized from his home. Indianapolis Metropolitan Police Department Officer Brett Seach testified about his examination of Worline's cell phone and how the data, including the text messages, was downloaded from the cell phone. Officer Seach further testified to his extensive training and experience with various methods used to extract data from cell phones. This evidence was sufficient to show that the messages were from Worline's cell phone.

Moreover, the background image on the home screen of Worline's cell phone was a picture of Taylor and Worline. The user generated device name was "ryan2." Tr. p. 601. The email accounts associated with that cell phone were "rdworline@aol.com," "rdworline@yahoo.com," and "rworline@me.com." Id. at 602. Included among the contacts portion of the cell phone was an entry for Taylor, which listed her phone number as ending in 8911. There also was contact information for Worline including (1) a picture of Worline, (2) email addresses rdworline@aol.com and rworline@me.com, (3) a link to Worline's Facebook account, (4) Worline's home address, and (5) a phone number ending in 1772, which was the same phone number associated with that iPhone.

Additionally, the text messages themselves included information regarding Worline's and Taylor's children that was unique enough to establish Worline as the author of the messages. *See Pavlovich*, 6 N.E.3d at 979 (circumstantial evidence, including familiarity with and detailed knowledge about unique matters, was sufficient to authenticate authorship of text and email messages). The facts of this case are even

stronger than those in *Pavlovich*, where the defendant's cell phone was never directly seized or searched. Here, Worline's cell phone was seized and searched directly. Taken all together, this evidence is more than sufficient to authenticate that Worline authored the text messages.

We now turn to the relevancy of the challenged evidence. Indiana Evidence Rule 401, prior to its amendment effective January 1, 2014, provided that "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." As stated in *Hicks v. State*, 690 N.E.2d 215, 221 (Ind. 1997):

> In sum, the standard for assessing the admissibility of 404(b) evidence in Indiana is: (1) the court must determine that the evidence of other crimes, wrongs, or acts is relevant to a matter at issue other than the defendant's propensity to commit the charged act; and (2) the court must balance the probative value of the evidence against its prejudicial effect pursuant to Rule 403. When inquiring into relevance, the court may consider any factor it would ordinarily consider under Rule 402. These may include the similarity and proximity in time of the prior bad act to the charged conduct, and will presumably typically include tying the act to the defendant. But these factors are simply illustrative of the many aspects that may, depending on the context, be required to show relevance.

Here, the text messages between Worline and Taylor, including the photograph of Worline mocking Jayden, who was depicted crying, are relevant to show the relationship between Worline and Jayden and motive for the murder. "Evidence of motive is always relevant in the proof of a crime." *Ross v. State*, 676 N.E.2d 339, 346 (Ind. 1996). Furthermore, "[a] defendant's prior bad acts are also usually admissible to show the relationship between the defendant and the victim." *Id.* The text messages revealed Worline's hatred for Jayden, his jealousy of the attention Jayden received, and resentment

10

of the amount of time Taylor devoted to his care. The texts also revealed Worline's frustration with their current living arrangements, with particular reference to Jayden, and Worline's indication that he believed he might snap. In those texts, Worline expressed how he hated coming into a room after Jayden because he could smell him.

The photograph of Worline holding Jayden and mocking him, dated one day prior to Jayden's death, is also indicative of the contentious relationship and possible motive for murder. The photograph is illustrative of Worline's feelings about Jayden immediately prior to Jayden's murder. This evidence, although adverse, was relevant to the murder charge.

Also, the testimony about the January 17, 2012 argument between Worline and Jayden's father, Noel, provided an additional motive for Jayden's murder. Worline called Noel a deadbeat, which led to Noel requesting that Worline no longer be present during Noel's parenting time with Jayden. The two engaged in a heated argument on the telephone during which both made threats. Worline was angry about the parenting situation as it pertained to Jayden, and Jayden's murder could be explained in part as the result of animus from the earlier argument.

Weighing the probative value of that evidence against its potential prejudice to Worline, we conclude that the evidence, which was relevant, was not excessively prejudicial to Worline. The text messages were sent in the months leading up to Jayden's murder until Worline's telephone stopped working. The photograph was taken the day before Jayden's murder. The argument between Worline and Noel occurred on the day Jayden was murdered. This evidence reflected Worline's feelings about Jayden and the

11

nature of the relationship months, days, and hours before Jayden's murder. They were relevant to the murder charge and the probative value outweighs any potential prejudice. The trial court did not abuse its discretion by admitting the challenged exhibits and testimony into evidence.

## II. ABUSE OF DISCRETION IN SENTENCING

Worline claims that the trial court abused its discretion by relying on two aggravating circumstances Worline contends were not supported by the evidence. The aggravating circumstances at issue were that (1) Jayden's injury or death was from shaken baby syndrome and (2) Worline hated Jayden.

> The standard of review for such a challenge is as follows:
>
> A trial court's sentencing order will be reviewed for an abuse of discretion. Such abuse occurs only if the decision is clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom. A trial court may abuse its discretion by
> > entering a sentencing statement that explains reasons for imposing a sentence—including a finding of aggravating and mitigating factors if any—but the record does not support the reasons, or the sentencing statement omits reasons that are clearly supported by the record and advanced for consideration, or the reasons given are improper as a matter of law.

*Rice v. State*, 6 N.E.3d 940, 943 (Ind. 2014) (internal citations and quotations omitted).

Indiana Code section 35-38-1-7.1(a)(9) (2012) provides that when a trial court is determining the sentence to be imposed for a crime, the trial court may consider that the injury to or death of the victim of the offense was the result of shaken baby syndrome as defined by statute. Indiana Code section 16-41-40-2 (1998) defines shaken baby syndrome

12

in pertinent part as the vigorous shaking of an infant or a young child that may result in bleeding inside the head, and cause death, closed head injury, or subdural hematoma. The record shows that Jayden's injuries could have been caused by Worline slamming Jayden into a door or wall, or throwing or dropping him on the ground. Worline contends that application of this aggravating factor is erroneous because, while there was evidence of the conditions that can be caused by shaken baby syndrome, there was no evidence that the conditions were caused by vigorous shaking.

Although there is no direct testimony to establish a vigorous shaking, there is enough evidence in the record to establish that Jayden was vigorously shaken. The forensic pathologist who testified about Jayden's injuries noted that he had bruising on his arms consistent with being grabbed or squeezed. Neighbors testified about hearing loud thumping noises over a period of time. A reasonable person could conclude that Jayden was vigorously shaken such that he suffered injuries consistent with shaken baby syndrome. This is so even though the final cause of Jayden's death was blunt force trauma to the head. The trial court did not abuse its discretion in finding this aggravating circumstance.

Worline also challenges the trial court's finding that Worline's hatred of Jayden was an aggravating circumstance. Initially, we observe that the written sentencing order does not reflect that hatred was found to be an aggravating circumstance. The trial court's statements about Worline's hatred of Jayden could have been made in support of its finding that Worline committed the murder while in a position of care, custody, or control of Jayden. It could also have been made in support of the finding that the murder was

13

committed because Worline's hatred of Jayden had enraged him to commit the murder in such a brutal manner. One could reasonably infer that a man who severely beat and finally killed a thirteen-month-old child under his care, hated the child.

To the extent Worline's hatred of Jayden was intended to be a separate aggravating circumstance, the evidence supports the trial court's finding. The text messages were replete with Worline's expressions of animosity and loathing of Jayden, a thirteen-month-old child. Not only do the messages reveal a motive for Jayden's murder, but reveal a motive to harm him extensively.

Assuming, *arguendo*, that those aggravating circumstances were improperly found, the result would have been the same. "Only one aggravator is necessary for the trial court to impose an enhanced sentence." *Georgopulos v. State*, 735 N.E.2d 1138, 1146 (Ind. 2000). "Even when a trial court improperly applies an aggravator, a sentence enhancement may be upheld if other valid aggravators exist." *Pickens v. State*, 767 N.E.2d 530, 535 (Ind. 2002).

Here, the trial court found that the nature of the crime was greater than the elements necessary to prove murder because Jayden was severely beaten, and was left to suffer from the blunt force injuries to his head without seeking assistance for him. Further, the trial court properly found that Jayden, the victim, who was thirteen-months old, was less than twelve years old. Ind. Code § 35-38-1-7.1(a)(3). A.W., who was almost two years old, was in the apartment when Jayden was murdered. Ind. Code § 35-38-1-7.1(a)(4). Worline had the care and control of Jayden at the time of Jayden's murder. Ind. Code § 35-38-1-7.1(a)(8). The presence of these valid and unchallenged aggravating circumstances support

14

the trial court's decision to impose an enhanced sentence.

## III.  INAPPROPRIATE SENTENCE

Worline seeks review of his sentence under Indiana Appellate Rule 7(B) claiming that his sentence is inappropriate in light of the nature of the offense and the character of the offender.  He claims that his lack of criminal history reflects on his character such that the trial court's sentencing choice is inappropriate.  At the time of Worline's sentencing, the sentencing range for a person convicted of committing murder was a fixed term of between forty-five years and sixty-five years with an advisory sentence of fifty-five years.  Ind. Code § 35-50-2-3 (2007).  The trial court imposed a sixty-five-year sentence with fifty-five years executed in the Department of Correction and ten years suspended with five years of probation.  Worline contends that he should have received a fifty-five-year sentence with ten years suspended.

Worline's sentence is within the range allowed by statute and the trial court's sentencing statement was detailed.  "The principal role of appellate review should be to attempt to leaven the outliers, and identify some guiding principles for trial courts and those charged with improvement of the sentencing statutes, but not to achieve a perceived 'correct' result in each case." *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008).  The defendant bears the burden of persuading the court on review that his sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006).

Regarding the character of the offender, the trial court noted that Worline essentially had no criminal record.  His arrest for public intoxication did not result in a conviction.  However, the nature of the offense supports the trial court's imposition of an enhanced

15

sentence. Worline, who was twenty-nine years old at the time he murdered Jayden, displayed a growing contempt for the thirteen-month-old child frequently left in his care. The injuries Jayden suffered were the result of a brutal beating that took some time to inflict. Jayden suffered a blow that fractured his skull, and the injuries were inflicted while another young child was present in the apartment. The fact that Worline would inflict such injuries on a baby is a reflection of a character unworthy of appellate relief under our standard of review. Worline has not met his burden of persuading us that his sentence is inappropriate.

<u>CONCLUSION</u>

In light of the above, we affirm the trial court's decision.

Affirmed.

VAIDIK, C.J., and RILEY, J., concur.

16