# FOR PUBLICATION



FILED

Dec 11 2014, 9:28 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**MATTHEW J. McGOVERN**
Anderson, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**BRIAN REITZ**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| ROBIN EUGENE MONTGOMERY, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 82A01-1404-CR-163 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE VANDERBURGH SUPERIOR COURT
The Honorable Robert J. Pigman, Judge
Cause No. 82D02-1308-FA-1138

**December 11, 2014**

**OPINION - FOR PUBLICATION**

**BRADFORD, Judge**

**CASE SUMMARY**

Between June 25, 2013 and August 24, 2013, Appellant-Defendant Robin Eugene Montgomery purchased a ten-count box of pseudoephedrine every ten days. At some point, officers from the Warrick County Sherriff's Office initiated an investigation into Montgomery's actions, during which the officers came to believe that Montgomery was operating a mobile methamphetamine laboratory. As part of their investigation, officers approached Montgomery at a storage unit located in Vanderburgh County on August 25, 2013. Montgomery attempted to flee from the officers in his vehicle, striking one officer and forcing another to have to dive out of the path of the vehicle. A chasing officer observed Montgomery throw a smoking yellow bag out of the window of his vehicle before Montgomery stopped the vehicle and was apprehended. Officers also discovered numerous items used during the course of the manufacture of methamphetamine in the storage unit, which was rented by Montgomery.

On August 27, 2013, Appellee-Plaintiff the State of Indiana (the "State") charged Montgomery with numerous crimes, including Class B felony dealing in methamphetamine and Class D felony resisting law enforcement. Following a jury trial, Montgomery was found guilty of these charges. The trial court subsequently sentenced Montgomery to an aggregate twelve-year sentence. On appeal, Montgomery contends that the trial court abused its discretion in admitting certain evidence at trial. Montgomery also contends that the evidence is insufficient to sustain his conviction for Class B felony dealing in methamphetamine. Concluding that the trial court did not abuse its discretion in admitting

2

the challenged evidence and that the evidence is sufficient to sustain Montgomery's conviction, we affirm.

## FACTS AND PROCEDURAL HISTORY

Between June 25, 2013 and August 24, 2013, Montgomery purchased a ten-count box of pseudoephedrine every ten days. At some point, Warrick County Sheriff's officers initiated an investigation into Montgomery's actions and, on August 15, 2013, placed a Global Positioning System ("GPS") tracker on Montgomery's vehicle. Based on the information learned during the course of their investigation, the officers started to suspect that Montgomery was operating a mobile methamphetamine laboratory.

On August 25, 2013, Warrick County Detective Timothy Pierce received an alert from the GPS tracker that Montgomery's vehicle had left the specific "zone" that Detective Pierce had set for the tracker and had entered Vanderburgh County. Detective Pierce learned that upon entering Vanderburgh County, Montgomery's vehicle went to a storage unit that was rented by Montgomery, left the storage unit, and returned to the storage unit shortly thereafter. Suspecting that Montgomery had transferred the methamphetamine laboratory to the storage unit, Detective Pierce requested assistance from the Evansville Police Department to confront Montgomery. Officers from the two departments met at a local store, drove to Montgomery's storage unit, parked, and began walking toward the storage unit.

While the officers were walking towards the storage unit, Montgomery slowly drove his vehicle out of the storage unit area. Montgomery's vehicle window was down. The officers shined their flashlights at Montgomery's vehicle and instructed him to stop the

3

vehicle. Specifically, Sergeant Richard Bennett of the Warrick County Sherriff's Department made eye-contact with Montgomery and instructed him to stop. Montgomery slowed his vehicle to a near stop. Believing that Montgomery was in the process of complying with the officer's orders, Evansville Police Officer Mark Saltzman crossed in front of Montgomery's vehicle. Montgomery, however, looked at the officers, re-gripped the vehicle's steering wheel, and accelerated "very hard." Tr. p. 153. Montgomery veered the vehicle towards the officers, striking Evansville Police Officer Shawn Smith in the thigh, causing a bruise, and forcing Officer Saltzman to have to dive out of the path of the van.

Detective Pierce returned to his police vehicle, initiated his lights and siren, and drove after Montgomery. Montgomery sped through a turn, crossing through an oncoming lane of traffic. While pursuing Montgomery, Detective Pierce smelled a chemical odor emanating from Montgomery's vehicle, which he knew, from his training and experience as a police officer, was associated with the manufacture of methamphetamine. Montgomery made another turn and threw a yellow plastic bag out of the driver's side window of his vehicle. Detective Pierce had to swerve to miss the bag, which had smoke coming out of it. Montgomery eventually stopped his vehicle and was apprehended.

Detective Pierce returned to the location where Montgomery had thrown the yellow plastic bag out of his window and found that the bag contained a plastic bottle that still had hydrochloric acid gas smoking from it. Detective Pierce could also hear the gas escaping from the bottle. Evansville Police Detective Patrick McDonald, a member of the Joint Drug Task Force within the Methamphetamine Suppression Unit, was dispatched to the location of

4

the plastic bag. After donning personal protective gear, Detective McDonald opened the bag and discovered a smoking HCL gas generator. Detective McDonald later explained that an HCL generator is "very dangerous," "extremely hazardous," and has no legitimate purpose. Tr. pp. 257, 329.

Detective McDonald subsequently conducted a search of Montgomery's storage unit, for which another officer had obtained a search warrant. Detective McDonald discovered various items used in the manufacture of methamphetamine in the storage unit, including: a smoking HCL generator, lye, sulfuric acid, two open instant cold packs containing ammonium nitrate, two one-pound containers of salt, a twenty-ounce soda bottle with a bi-layer liquid—meaning that one level was water and the other was an organic solvent—that strongly smelled of ether, several pieces of burnt foil, an open package of coffee filters, a pipe cutter, and a plastic funnel with white residue. The bi-layer liquid was later tested and found not to contain any controlled substances.

On August 27, 2013, the State charged Montgomery with two counts of Class A felony attempted murder, one count of Class B felony dealing in methamphetamine, and one count of Class D felony resisting law enforcement. Following a three-day trial, a jury found Montgomery guilty of the Class B felony dealing in methamphetamine and Class D felony resisting law enforcement charges. With regard to the Class A felony attempted murder charges, the jury found Montgomery guilty of the lesser-included offenses of Class A misdemeanor criminal recklessness. The trial court subsequently merged the Class A misdemeanor criminal recklessness convictions with Montgomery's conviction for Class D

5

felony resisting law enforcement. The trial court sentenced Montgomery to a ten-year term for the Class B felony dealing in methamphetamine conviction and a two-year term for the Class D felony resisting law enforcement conviction. The trial court ordered that the sentences be served consecutively, for an aggregate term of twelve years, all of which would be served in the Department of Correction. This appeal follows.

## DISCUSSION AND DECISION

### I. Admission of Evidence

Montgomery contends that the trial court abused its discretion in admitting certain evidence at trial.

### A. Standard of Review

The admission or exclusion of evidence is entrusted to the discretion of the trial court. *Collins v. State*, 966 N.E.2d 96, 104 (Ind. Ct. App. 2012) (citing *Farris v. State*, 818 N.E.2d 63, 67 (Ind. Ct. App. 2004).

> We will reverse a trial court's decision only for an abuse of discretion. [*Farris*, 818 N.E.2d at 67]. We will consider the conflicting evidence most favorable to the trial court's ruling and any uncontested evidence favorable to the defendant. *Taylor v. State*, 891 N.E.2d 155, 158 (Ind. Ct. App. 2008). An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court or it misinterprets the law. *Id.* In determining whether an error in the introduction of evidence affected an appellant's substantial rights, we assess the probable impact of the evidence on the jury. *Oldham v. State*, 779 N.E.2d 1162, 1170 (Ind. Ct. App. 2002). Admission of evidence is harmless and is not grounds for reversal where the evidence is merely cumulative of other evidence admitted. *Pavey v. State*, 764 N.E.2d 692, 703 (Ind. Ct. App. 2002).

*Id.*

6

## B. National Precursor Log Exchange ("NPLEx") Records

Montgomery challenges the admission of the NPLEx records, claiming that the admission of the NPLEx records violated his rights under the Confrontation Clause. For its part, the State argues that the admission of the NPLEx records did not violate Montgomery's rights under the Confrontation Clause. We agree with the State.

### 1. Overview of Requirement to Document the Purchase of Ephedrine and Pseudoephedrine

Indiana Code section 34-48-4-14.7(e) provides that "[a] person may not purchase drugs containing more than:

(1) three and six-tenths (3.6) grams of ephedrine or pseudoephedrine, or both, on one (1) day;
(2) seven and two-tenths (7.2) grams of ephedrine or pseudoephedrine, or both, in a thirty (30) day period; or
(3) sixty-one and two-tenths (61.2) grams of ephedrine or pseudoephedrine, or both, in a three hundred sixty-five (365) day period.[1]

In order to enforce these limitations, Indiana Code section 35-48-4-14.7(d) sets forth certain requirements that a retailer must meet if the retailer sells ephedrine or pseudoephedrine. One of these requirements is that the retailer must maintain records of all sales of a nonprescription product containing ephedrine or pseudoephedrine. These records shall include: (1) the name and address of each purchaser; (2) the type of identification presented; (3) the governmental entity that issued the identification; (4) the identification number; and (5) the ephedrine or pseudoephedrine product purchased, including the number of grams the product contains and the date and time of the transaction. Ind. Code § 35-48-4-14.7(d)(4).

---

[1] These limits apply to the total amount of base ephedrine and pseudoephedrine contained in the

In addition to maintaining these records, Indiana Code section 35-48-4-14.7(d)(5) requires that before a retailer may complete the sale of an over-the-counter product containing pseudoephedrine or ephedrine, the retailer *shall*

> electronically submit the required information to the [NPLEx] administered by the National Association of Drug Diversion Investigators (NADDI), if the NPLEx system is available to pharmacies or NPLEx retailers in the state without a charge for accessing the system. The [retailer] may not complete the sale if the system generates a stop sale alert.

If a retailer selling an over-the-counter product containing ephedrine or pseudoephedrine experiences mechanical or electronic failure of the electronic sales tracking system and is unable to comply with the electronic sales tracking requirement, the retailer *shall* maintain a written log or an alternative electronic recordkeeping mechanism until the retailer is able to comply with the electronic sales tracking requirement. Ind. Code § 35-48-4-14.7(d)(6). Indiana Code section 35–48–4–14.7(j) imposes criminal liability for a knowing or intentional failure to comply with the requirements of Indiana Code section 35-48-4-14.7(d).

Indiana Code section 35–48–4–14.7(l) sets forth requirements that apply to the NPLEx reports. This section provides that (1) the information contained in the NPLEx report may be shared only with law enforcement officials; (2) a law enforcement official must be permitted to access Indiana transaction information maintained in the NPLEx for investigative purposes; (3) NADDI may not modify sales transaction data that is shared with law enforcement officials; and (4) at least one time per week, NADDI shall forward Indiana data contained in the NPLEx, including data concerning a transaction that could not be

products and not to the overall weight of the products.

8

completed due to the issuance of a stop sale alert, to the State Police Department.

## 2. Analysis

Again, Montgomery argues that the admission of the NPLEx records violated his rights under the Confrontation Clause. The Sixth Amendment to the United States Constitution, made applicable to the States via the Fourteenth Amendment, states: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. CONST. amend. VI. The Confrontation Clause prohibits the admission of an out-of-court statement if it is testimonial, the declarant is unavailable, and the defendant had no prior opportunity to cross-examine the witness. *King v. State*, 985 N.E.2d 755, 758 (Ind. Ct. App. 2013) (citing *Crawford v. Washington*, 541 U.S. 36, 59, 124 S. Ct. 1354, 1369 (2004)), *trans. denied*. Although the *Crawford* court intentionally refrained from defining which evidence is testimonial, it listed three "formulations of this core class of 'testimonial' statements": (1) "*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially;" (2) "extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions;" and (3) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Crawford*, 541 U.S. at 50-52, 124 S.Ct. at 1364.

"Business and public records are generally admissible absent confrontation not

9

because they qualify under an exception to the hearsay rules, but because—having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324, 129 S. Ct. 2527, 2539-40 (2009). Montgomery acknowledges the holding in *Melendez–Diaz* but argues that the NPLEx reports should not qualify as business records because the NPLEx records were not used for any legitimate business purpose. We disagree.

We have previously held that NPLEx records qualified as business records under Evidence Rule 803(6). *See Embrey v. State*, 989 N.E.2d 1260, 1267 (Ind. Ct. App. 2013). Further, although NPLEx records may occasionally be used to establish or prove some fact at trial, that is not the main purpose of the NPLEx records. Again, the main purpose of the NPLEx records is to enable the NADDI to track and regulate the sale of non-prescription ephedrine and pseudoephedrine. Accordingly, the main purpose of the NPLEx records is not to establish or prove some fact at trial. As such, in light of the United States Supreme Court's holding in *Melendez-Diaz*, we conclude that the records are not testimonial and that the admission of NPLEx records at trial did not violate Montgomery's rights under the Confrontation Clause. Montgomery's claim to the contrary therefore fails.[2]

---

[2] This conclusion is consistent with opinions issued by the United States Court of Appeals in the Fifth and Eighth Circuits. *See U.S. v. Towns*, 718 F.3d 404, 411 (5th Cir. 2013) (recognizing that states have a clear interest in businesses creating NPLEx logs that extends beyond the evidentiary value of the logs and concluding that because the purchase logs were not prepared specifically and solely for use at trial, they are not testimonial and do not violate the Confrontation Clause); *U.S. v. Mashek*, 606 F.3d 922, 930 (8th Cir. 2010) (providing that the admission of the pseudoephedrine logs did not violate the defendants constitutional rights because the pseudoephedrine logs were kept in the ordinary course of business pursuant to Iowa law and are business records and business records are non-testimonial statements to which the Confrontation Clause does not apply).

## C. Evidence Relating to the Identification of Precursors

Indiana Code section 35-48-4-14.5(a) lists several chemical agents as precursors for the manufacture of controlled substances such as methamphetamine. At trial, the State introduced evidence that Montgomery possessed three of the precursors listed in Indiana Code section 35-48-4-15.5(a), namely sulfuric acid, lye,[3] and ammonium nitrate, at the time of his arrest as evidence of his intent to manufacture and deal in methamphetamine. Montgomery challenges the admission of evidence relating to the identification of these precursors, claiming that the State failed to provide an adequate foundation for admission of the evidence. Montgomery also claims that some of the challenged evidence constituted inadmissible hearsay. For its part, the State argues that the trial court did not abuse its discretion by admitting the evidence relating to the identification of the precursors. Again, we agree with the State.

### 1. Overview of Relevant Authority

#### i. Laying a Proper Foundation

"The determination of whether a witness is qualified to testify as an expert is within the sound discretion of the trial court, whose ruling will not be disturbed absent an abuse of discretion." *Clark v. State*, 6 N.E.3d 992, 998 (Ind. Ct. App. 2014) (citing *Copeland v. State*, 430 N.E.2d 393, 396 (Ind. Ct. App. 1982)).

> In order to qualify as an expert, the subject matter must be related to some scientific field beyond the knowledge of the average lay person, and the witness must have sufficient skill, knowledge or experience in the field to

---

[3] Lye is also referred to as sodium hydroxide.

11

> make it appear that the witness's opinion or inference will aid the trier of fact. No precise quantum of knowledge is required if the witness shows a sufficient acquaintance with the subject. *Fox v. State* (1987), Ind., 506 N.E.2d 1090.

*Wissman v. State*, 540 N.E.2d 1209, 1212-13 (Ind. 1989). "The qualifications of an expert may be established by practical experience as well as by formal training." *Clark*, 6 N.E.3d at 998 (citing Copeland, 430 N.E.2d at 396).

The Indiana Supreme Court has held that an opinion of someone sufficiently experienced with a substance or a drug may establish its identity, as may other circumstantial evidence. *Vasquez v. State*, 741 N.E.2d 1214, 1216 (Ind. 2001). "Although chemical analysis is one way, and perhaps the best way, to establish the identity of a compound, persons experienced in the area may be able to identify [the compound]. This is true even if every citizen may not be up to that task." *Id*. at 1216-17. As such, the testimony of a police officer who, by their training, knowledge, and experience, is sufficiently experienced with a compound may establish its identity. *See Clark*, 6 N.E.3d at 999; *Boggs v. State*, 928 N.E.2d 855, 866 (Ind. Ct. App. 2010).

### ii. Hearsay

"Hearsay is an out-of-court statement made by someone other than the declarant and offered to prove the truth of the matter asserted." *Reemer v. State*, 835 N.E.2d 1005, 1007 (Ind. 2005). In *Reemer*, the Indiana Supreme Court concluded that labels of commercially marketed drugs are properly admitted into evidence under the exception provided by Evidence Rule 803(17) to prove the composition of the drug. *Id*. at 1009. In reaching this conclusion, the Indiana Supreme Court noted the following:

12

As the Iowa Supreme Court observed, "the contemporary nature of pharmaceutical practice exemplifies the inherent trustworthiness" of the labels on cold medication. [*State v. Heuser*, 661 N.W.2d 157, 164 (Iowa 2003)]. Indeed, physicians, patients and the general public routinely rely on regulated manufacturing practices and mandatory labeling to assure that pharmaceuticals are as they are represented to be.

*Id*. We believe the same is true for products containing poisonous chemicals. Like pharmaceutical labels, physicians, patients, and the general public routinely rely on labeling on products containing poisonous chemicals for information relating to what poisonous chemicals are contained therein in the case of possible exposure. As such, we conclude that the rationale set forth in *Reemer* applies equally to packaging for items containing poisonous chemicals.

## 2. Analysis

### i. Sulfuric Acid

Montgomery argued that the trial court erroneously admitted the label of a bottle of drain cleaner which indicated that the drain cleaner contained sulfuric acid into evidence because the State failed to lay a proper foundation for the contents of the bottle. Specifically, Montgomery argued that the label on the bottle which indicated that the bottle contained sulfuric acid amounted to inadmissible hearsay.

During trial, Detective McDonald testified that he recovered a quart container of sulfuric acid-based drain cleaner during his search of Montgomery's storage unit. Detective McDonald did not provide any specific testimony relating to the odor or unique characteristics of sulfuric acid but rather relied upon the label of the bottle in question as the

13

basis of his testimony that he recovered sulfuric acid from Montgomery's storage unit. In addition to Detective McDonald's testimony, the State presented pictures of the label of the bottle as evidence at trial. The label indicated that the product was called "Kleen-Out Sulfuric Acid Drain Opener." State's Exs. 12-13. In addition to having the words "sulfuric acid" in the name of the product, the label for the product also explicitly stated the following:

> DANGER · POISON
> CAUSE SEVERE BURNS
> HARMFUL OR FATAL IF SWALLOWED
> *CONTAINS INHIBITED SULFURIC ACID*

State's Ex. 12 (emphasis added). The trial court determined that the label laid a sufficient foundation to prove that the bottle contained sulfuric acid. The trial court acted within its discretion in this regard.

Further, we disagree with Montgomery's contention that *Reemer* adds an additional foundational requirement for admission of a label, *i.e.*, that the product be unopened so as to ensure that the substance within has not been altered. In this vein, we note that any conflict as to the reliability of the evidence is to be resolved by the trier-of-fact. *See Burp v. State*, 612 N.E.2d 169, 172 (Ind. Ct. App. 1993) (citing *Hopkins v. State*, 579 N.E.2d 1297, 1304 (Ind. 1991)). We will uphold a finding of the trier-of-fact as long as the favorable evidence adequately supports it. *Burp*, 612 N.E.2d at 172 (citing *Hopkins*, 579 N.E.2d at 1304). Montgomery did not provide any evidence suggesting that the contents of the bottle of drain cleaner had been altered or was not the sulfuric acid-based drain cleaner indicated on the label of the bottle. As such, we will not disturb the jury's apparent determination that the

14

bottle contained sulfuric acid-based drain cleaner.

*ii. Lye*

Montgomery also argued that the trial court erroneously admitted Detective McDonald's testimony relating to an unlabeled white bottle which Detective McDonald indicated was lye. Specifically, Montgomery argued that the State failed to lay a proper foundation to prove that Detective McDonald was qualified to testify about the substance found in the unlabeled white bottle.

Again, Detective McDonald was a member of the Joint Drug Task Force within the Methamphetamine Suppression Unit. Due to the high number of methamphetamine labs discovered in Vanderburgh County, every detective assigned to the Joint Drug Task Force "has to go through what's called a State and Local Clandestine Lab School," a five-day school at the DEA Academy in Quantico, Virginia. Tr. p. 248. "The primary focus of … that school is methamphetamine labs and [participants] learn about the different types of labs, the chemicals used in those labs, and [participants] also manufacture methamphetamine as part of the conclusion of that school." Tr. p. 249. In addition to the clandestine lab school, Detective McDonald also attended specialized methamphetamine investigation courses, undercover and surveillance schools, and a one-week class at the DEA Academy "called a Site Safety Officer." Tr. p. 249. The "Site Safety Officer" class "deals specifically with a supervising role at clandestine labs where you direct other detectives or offices to make sure that they adhere to safety guidelines. It also enables you to give the annual refresher training on clandestine labs to lab certified officers and detectives." Tr. p. 249. Detective McDonald

15

has also received additional training on the detection and identification of ingredients used to manufacture methamphetamine through the Indiana Law Enforcement Academy. Whether through training or his experience as a police detective, Detective McDonald indicated that he had encountered manufacturing ingredients, *i.e.*, precursors, "probably well over 500 times." Tr. p. 251.

During trial, Detective McDonald testified that he recovered "an unlabeled white bottle that contained a white powder substance [which] in [Detective McDonald's] experience had the appearance of lye" during his search of Montgomery's storage unit. Tr. pp. 285-86. Specifically, Detective McDonald testified that when he opened the unlabeled white bottle he "found it contained a material [which] in [his] experience and training [was] consistent with lye." Tr. p. 292. Further, during a hearing outside of the presence of the jury, Detective McDonald testified that he was "certain [the substance] was lye based on its appearance." Tr. p. 273.

Detective McDonald unequivocally identified the contents of the unlabeled white bottle as lye. Upon review, we conclude that Detective McDonald, through his training and knowledge was sufficiently experienced with the compound of lye, and therefore could establish its identity. *See generally Clark*, 6 N.E.3d at 999; *Boggs*, 928 N.E.2d at 866. As such, we further conclude that the trial court did not abuse its discretion in admitting Detective McDonald's identification of the substance as the State presented a proper foundation for Detective McDonald's testimony.

*iii. Ammonium Nitrate*

16

Montgomery also argued that the trial court erroneously admitted Detective McDonald's testimony relating to ammonium nitrate pellets which were found in open cold packs. Specifically, Montgomery argued that the State failed to lay a proper foundation to prove that Detective McDonald was qualified to testify about the substance found in the cold packs.

The State laid a foundation for Detective McDonald's identification of the ammonium nitrate pellets during questioning of Detective McDonald that was conducted outside of the presence of the jury. This questioning went as follows:

> Q    Okay. With regard to the cold packs that had been cut open. Did those have anything in them?
> A    Yes.
> Q    What did they have in them?
> A    They appeared to have ammonium nitrate pellets through my experience.
> Q    Okay. Now you've seen those ammonium nitrate pellets before, is that correct?
> A    Yes from that same brand of cold pack.
> Q    Okay. You'd be able to recognize them whenever you saw them again?
> A    Yes.
> ****
> Q    You didn't do any testing of the white granules that you believed was ammonium nitrate?
> A    Correct.
> Q    And they differ in some respect to other powdered substance or granular substances? You can just automatically tell that's what it is?
> A    I think that's a very broad question. Based on what I observed in the container, in my experience using that same product in manufacturing methamphetamine, that was the exact same thing that I pulled out of it.
> ****
> Q    And the same thing with regard to the granules. Could have been something else that was granulated but based upon your training, based upon what you anticipated you were going to see, you believed it was ammonium nitrate granules?
> A    Yes. Based on what I removed from that same package before that had

17

the exact same appearance.

Tr. pp. 271-273.

During trial, Detective McDonald testified that he recovered "two cut open instant cold packs containing ammonium nitrate" during his search of Montgomery's storage unit. Tr. p. 286. The cold packs had been re-secured with a rubber band after being cut open. Detective McDonald opened the cold packs and discovered that they contained ammonium nitrate. Detective McDonald testified that he was familiar with the particular brand of cold pack, stating: "Yes. I've cut open these same cold packs before, [they're] Walgreen's Instant Cold Packs, and the material inside it, in my experience, is the exact same material that I removed from them previously." Tr. p. 291.

Detective McDonald unequivocally identified the contents of the cold packs as ammonium nitrate pellets. Upon review, we conclude that Detective McDonald, through his training and knowledge, was sufficiently experienced with the ingredients used in the particular brand of cold pack recovered from Montgomery's storage unit, and therefore could establish the identity of the substance found inside the cold packs. *See generally Clark*, 6 N.E.3d at 999; *Boggs*, 928 N.E.2d at 866. As such, we further conclude that the trial court did not abuse its discretion in admitting Detective McDonald's identification of the substance as the State presented a proper foundation for Detective McDonald's testimony.

## II. Sufficiency of the Evidence

Montgomery also contends that the evidence is insufficient to sustain his conviction for Class B felony dealing in methamphetamine.

## A. Standard of Review

> When reviewing the sufficiency of the evidence to support a conviction, appellate courts must consider only the probative evidence and reasonable inferences supporting the verdict. It is the fact-finder's role, not that of appellate courts, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction. To preserve this structure, when appellate courts are confronted with conflicting evidence, they must consider it most favorably to the trial court's ruling. Appellate courts affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. It is therefore not necessary that the evidence overcome every reasonable hypothesis of innocence. The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict.

*Drane v. State*, 867 N.E.2d 144, 146-47 (Ind. 2007) (citations, emphasis, and quotations omitted). "In essence, we assess only whether the verdict *could* be reached based on reasonable inferences that may be drawn from the evidence presented." *Baker v. State*, 968 N.E.2d 227, 229 (Ind. 2012) (emphasis in original). Upon review, appellate courts do not reweigh the evidence or assess the credibility of the witnesses. *Stewart v. State*, 768 N.E.2d 433, 435 (Ind. 2002).

## B. Analysis

The offense of dealing in methamphetamine is governed by Indiana Code section 35-48-4-1.1, which on the date in question read as follows:

> (a) A person who:
>     (1) knowingly or intentionally:
>         (A) manufactures;
>         (B) finances the manufacture of;
>         (C) delivers; or
>         (D) finances the delivery of;
>     methamphetamine, pure or adulterated; or
>     (2) possesses, with intent to:
>         (A) manufacture;

19

(B) finance the manufacture of;
(C) deliver; or
(D) finance the delivery of;
methamphetamine, pure or adulterated;
commits dealing in methamphetamine, a Class B felony.

Indiana Code section 35-48-1-18(1)(a) defines the term "manufacture" as

the production, preparation, propagation, compounding, conversion, or processing of a controlled substance, either directly or indirectly by extraction from substances of natural origin, independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis, and includes any packaging or repackaging of the substance or labeling or relabeling of its container.

Indiana Code section 35-48-1-18(1)(a) "does not state that the process must be completed or that there must actually be a final product before it applies." *Bush v. State*, 772 N.E.2d 1020, 1023 (Ind. Ct. App. 2002). A trier-of-fact may rely on circumstantial evidence in determining that an individual is manufacturing methamphetamine. *Id*. (providing that "[c]ommon sense dictates that we reach this conclusion to avoid an absurd result.… [A] reasonable juror in this case could certainly conclude that Bush manufactured methamphetamine based upon the circumstantial evidence of its production. In fact, there was no other reasonable explanation for the evidence found at the house other than that he was in the process of making methamphetamine.").

In the instant matter, the evidence is sufficient to prove that Montgomery manufactured methamphetamine. Detective McDonald described the methamphetamine manufacturing process at trial. He opined that it appeared that Montgomery was utilizing the "one pot method" for manufacturing methamphetamine. In this method, a person would

20

typically use a bottle, such as a plastic two liter bottle or twenty ounce plastic soda bottle, and, instead of using anhydrous ammonia, would use lye and an instant cold pack.

> You cut open the instant cold pack. Inside there's little white beads that are ammonium nitrate and there's also a water pack. The water pack is typically discarded but when you combine the ammonium nitrate beads with lye in that two liter bottle it creates a very strong ammonia gas.… You would combine that with ground up pseudoephedrine-based cold medicine, some type of organic solvent. Most typically we see Coleman camp fuel because it has a very low odor.… You can also use ether which has a very strong odor. You can use acetone, again, fingernail polish remover. It has a very strong odor.… A little bit of water and the contents of a stripped lithium battery. Those things are all combined in that two liter bottle. Put the cap on, shake it up. You may have to add some more lye, some more ammonium nitrate once the reaction goes and typically in about 45 minutes to an hour that pseudoephedrine is dissolved and converted to methamphetamine oil and that's held in solution in that solvent, whatever organic solvent you used.… It's a liquid. The methamphetamine at that point is a liquid inside that solvent. So the person would want to pull that solvent out of the two liter bottle typically using a turkey baster or syringe, anything will work like that. And then all of the material that's left in that reaction vessel, that two liter bottle is just trash. All you want out of that is the solvent that has the meth oil in it. Typically a person will put that in another vessel … [m]ost typically … [a] [t]wenty ounce soda bottle. A person would combine Liquid Fire or any sulfuric acid based drain cleaner with salt and when those two are combined in the bottle it produces a whitish colored gas that is highly acidic.… A hole is cut in the top of one of those soda bottles, the 20 ounce for the HCL generator, and airline tubing is run through that cap. Aquarium hose is typically what you see and then as that salt and sulfuric acid are combined in the bottle it produces pressure. The reaction causes that gas to travel through the tube and the person would hold that and the tube would go over the methamphetamine oil … and the combination makes solid meth come out of that solvent. So then what they would do is get [a] Mason jar and put a coffee filter in it and pour that solvent with the solid meth in it through the coffee filter and what's left behind in the coffee filter is a white or brownish colored residue and that's the actually finished methamphetamine and instead of methamphetamine oil, that's methamphetamine salts and once it's dried out on a candle warmer, a hot plate, or just left to air dry, once it's completely dry then that's methamphetamine in it's usable sustainable form and it's water soluble and ready to be smoked, injected, snorted however a person would want to use it.

Tr. pp. 253-56.

With respect to Montgomery, the State presented evidence that over a span of two months, Montgomery purchased a box of pseudoephedrine every ten days. In addition, at the time of Montgomery's arrest, Montgomery was in possession of various items used in the manufacture of methamphetamine, including: a smoking HCL generator, lye, sulfuric acid, two open instant cold packs containing ammonium nitrate, two one-pound containers of salt, a twenty ounce soda bottle with a bi-layer liquid—meaning that one level was water and the other was an organic solvent—that strongly smelled of ether, several pieces of burnt foil, an open package of coffee filters, a pipe cutter, and a plastic funnel with white residue. With regard to the pipe cutter, Detective McDonald testified that the instrument is generally used to cut open lithium batteries.

Further, it is of note that Montgomery fled the scene upon being approached by law enforcement. The Indiana Supreme Court has previously held that "[e]vidence of flight may be considered as circumstantial evidence of consciousness of guilt." *Brown v. State*, 563 N.E.2d 103, 107 (Ind. 1990). The trier-of-fact could therefore consider Montgomery's flight as circumstantial evidence of a consciousness of guilt by Montgomery.

Again, the manufacturing process need not be completed before one can be found to have manufactured methamphetamine. *Bush*, 772 N.E.2d at 1023. In fact, this court has previously held that the mere act of crushing up pills "in order to separate the ephedrine from the pill binders" is sufficient to prove that the manufacturing process has begun. *See Dawson v. State*, 786 N.E.2d 742, 748 (Ind. Ct. App. 2003) (providing that "once an individual

22

crushes up pills in order to separate the ephedrine from the pill binders, the manufacturing process has begun" and evidence of such is sufficient to support a conviction for dealing in methamphetamine by knowingly manufacturing it). In the instant matter, the smoking HCL generator and the open cold packs suggest that Montgomery had begun the process of manufacturing methamphetamine. In light of our prior conclusions in *Bush* and *Dawson*, we conclude that the evidence that Montgomery had been the manufacturing process coupled with the evidence recovered from Montgomery's storage unit and the evidence of Montgomery's attempted flight, is sufficient to prove that Montgomery committed the offense of dealing in methamphetamine by knowingly manufacturing it.

Furthermore, we are unpersuaded by Montgomery's claim that the State relied on pure speculation to support his conviction for manufacturing methamphetamine. Montgomery claims that "[w]ithout a 'reaction vessel,' complete methamphetamine lab, or the necessary ingredients for producing methamphetamine, this Court should conclude that the State failed to prove beyond a reasonable doubt that Montgomery was manufacturing methamphetamine." Appellant's Br. pp. 25-26. We disagree. Again, the State presented evidence at trial that Montgomery repeatedly purchased pseudoephedrine and was in possession of numerous items used in the manufacture of methamphetamine at the time of his arrest. We conclude that the above-stated evidence was sufficient to prove that Montgomery was manufacturing methamphetamine. Montgomery's claim to the contrary effectively amounts to an invitation for this court to reweigh the evidence, which we will not do. *See Stewart v. State*, 768 N.E.2d at 435.

23

**CONCLUSION**

Having concluded that the trial court did not abuse its discretion in admitting the challenged evidence at trial and that the evidence is sufficient to sustain Montgomery's conviction for Class B felony dealing in methamphetamine, we affirm the judgment of the trial court.

The judgment of the trial court is affirmed.

NAJAM, J., and MATHIAS, J., concur.