## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jul 21 2015, 5:30 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Jesse R. Poag
Newburgh, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Eric P. Babbs
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Robert S. Kaufman,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

July 21, 2015

Court of Appeals Case No.
82A01-1411-CR-516

Appeal from the Vanderburgh
Circuit Court.
The Honorable Kelli E. Fink,
Magistrate.
Cause No. 82C01-1310-FA-1069

**Darden, Senior Judge**

# Statement of the Case

Robert S. Kaufman appeals from his conviction after a jury trial of dealing in methamphetamine[1] as a Class A felony, challenging the sufficiency of the evidence to support his conviction. We affirm in part, reverse in part and remand with instructions.

# Issues

Kaufman presents the following issues for our review:

I.    Whether the State presented sufficient evidence that the Wood Creek Inn & Suites was a family housing complex at the time of the offense.

II.   Whether the State presented sufficient evidence that Kaufman had taken a substantial step toward production of methamphetamine.

# Facts and Procedural History

On June 23, 2013, at approximately 5:29 p.m. Kaufman purchased 1.2 grams of pseudoephedrine from a Walgreens Store located on Green River Road in Evansville, Indiana. Later that same day, shortly before 11:00 p.m., Evansville Police Department officers responded to a tip about a possible meth lab site. They arrived at a railroad bridge near the Wood Creek Inn & Suites located just west of Old U.S. Highway 41 where they discovered several items often associated with the manufacture of methamphetamine. Those items were as

---

[1] Ind. Code § 35-48-4-1.1 (2006).

follows: empty pseudoephedrine blister packs; a Walgreens receipt showing the purchase of pseudoephedrine earlier that day; a box of ammonium nitrate cold packs, one of which had been cut open and its contents removed; an empty can of starting fluid, which was punctured on the bottom; a two-pound container of lye; packaging for lithium batteries; remnants of stripped batteries; one intact battery; at least one pair of pliers; a clear glass jar; a twenty ounce soda bottle; and coffee filters.

[4] While officers were investigating the site, another officer observed Kaufman walking south along Old U.S. Highway 41 and approaching the parking lot of the Wood Creek Inn & Suites. Kaufman entered the parking lot where he spoke with a woman. While Kaufman was speaking to the woman, the officer approached him, and took him into custody, and he was later interviewed.

[5] During the interview, Detective Chris Goergen asked Kaufman to recount where he had been throughout the day. According to Kaufman, he had awakened at approximately 3 p.m., met a friend and had something to eat. At approximately 4:00 p.m. he encountered some people in a green car. They went to a Walmart, but none of them went inside. He stated that just prior to being taken into custody, he had walked to a nearby Motel 6 and was walking south toward the Wood Creek Inn & Suites when he encountered police officers. Kaufman was not charged at that time.

[6] Officers continued their investigation into the suspected meth lab site. An officer was able to recover a latent fingerprint from the packaging of the cold

packs found under the bridge, and the fingerprint was later identified as Kaufman's. The packaging also had two other fingerprints from unknown individuals. Officers matched the Walgreens receipt found underneath the bridge with video tape of Kaufman's purchase of pseudoephedrine on June 23, 2013, and an NPLEx[2] report of that purchase. There was no finished product or evidence of methamphetamine found at the site.

[7] A warrant was issued for Kaufman's arrest on September 30, 2013. The officer who took Kaufman into custody on October 2, 2013, explained to Kaufman that the arrest was for the incident near the Wood Creek Inn & Suites for manufacturing methamphetamine. Kaufman stated that in his opinion, the case should be charged as possession of precursors. At the conclusion of Kaufman's jury trial, the jury found Kaufman guilty of Class A felony dealing in methamphetamine. The trial court sentenced Kaufman to thirty-four years in the Department of Correction. Kaufman now appeals.

## Discussion and Decision

[8] Kaufman raises two challenges to the sufficiency of the evidence supporting his conviction. First, he argues that there is insufficient evidence to establish that the Wood Creek Inn & Suites was a family housing complex at the time of the

---

[2] NPLEx is an acronym for the National Precursor Log Exchange. *See Embrey v. State*, 989 N.E.2d 1260, 1263 (Ind. Ct. App. 2013).

offense. He also challenges the sufficiency of the evidence that he took a substantial step toward the manufacture of methamphetamine.

[9] The jury was instructed on the elements of the charged offense and the lesser-included offenses of attempted dealing in methamphetamine as a Class A felony, dealing in methamphetamine as a Class B felony, possession of chemical reagents or precursors with the intent to manufacture a controlled substance as a Class C felony, and possession of chemical reagents or precursors with the intent to manufacture a controlled substance as a Class D felony. The jury returned its verdict of guilty as to the charged offense.

[10] Our standard of review for claims challenging the sufficiency of the evidence is well-settled. We do not reweigh the evidence or reassess the credibility of witnesses in the course of our review. *Boggs v. State*, 928 N.E.2d 855, 864 (Ind. Ct. App. 2010), *trans. denied*. We consider only the probative evidence and reasonable inferences supporting the verdict and consider conflicting evidence most favorably to the trial court's ruling. *Id.* The conviction will be affirmed unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. *Id.* It is not necessary that the evidence presented at trial overcome every reasonable hypothesis of innocence. *Id.* We will conclude that the evidence is sufficient if an inference may reasonably be drawn from it to support the verdict. *Id.*

# I. Family Housing Complex

[11]   Kaufman argues that there is insufficient evidence in the record to establish that Wood Creek Inn & Suites was a family housing complex at the time of the offense. In order to convict Kaufman of dealing in methamphetamine as a Class A felony, the State was required to prove beyond a reasonable doubt that Kaufman knowingly or intentionally manufactured methamphetamine in, on, or within one thousand feet of a family housing complex. Ind. Code § 35-48-4-1.1(b)(3)(B)(iii). A family housing complex is defined in pertinent part as "a building or series of buildings that contains at least twelve (12) dwelling units that is operated as a hotel or motel (as described in IC 22-11-18-1)." Ind. Code § 35-31.5-2-127 (2012). Hotels and motels are defined in Indiana Code section 22-11-18-1 (2012) as "buildings or structures kept, maintained, used, advertised, or held out to the public as inns or places where sleeping accommodations are furnished for hire for transient guests."

[12]   David Huffine, the general manager of the Wood Creek Inn & Suites, testified that it is "an extended stay hotel" that rents by the week and the month. Tr. p. 198. There are eighty-six rooms of which thirty-two are apartments. Huffine stated that at the time of trial sixty-three units were rented and that of the families staying there approximately twenty percent had children. On cross-examination, Huffine testified that the Wood Creek Inn & Suites was not a motel or a hotel, but was "extended stay." Tr. p. 201.

[13]   Linda Freeman, Chief Deputy of the Vanderburgh County Surveyor's Office, testified about a map she had produced showing what places and buildings

were within one thousand feet of what she described as "Wood Creek Apartments." Tr. p. 210. The bridge under which the suspected meth lab site was located was within one thousand feet of Wood Creek Inn & Suites.

[14] In *Richard v. State*, 19 N.E.3d 284 (Ind. Ct. App. 2014), we considered this issue with respect to a conviction for dealing in cocaine within one thousand feet of a public park. One of the contentions on appeal challenged the sufficiency of the evidence that the Garden Estates Housing Complex was a family housing complex at the time of the offense. In concluding that the evidence was insufficient, we noted that while the State had established that the family housing complex operated as such at the time of trial, the State had not established that it was such at the time of the offense. We held that "[t]he fact that a family housing complex existed *at the time of the offense* is an essential element of the charge." 19 N.E.3d at 287 (emphasis in original).

[15] Here, the State established on direct examination that the Wood Creek Inn & Suites operated as a family housing complex at the time of trial. However, there was no evidence presented by the State to establish that it operated as such at the time of the offense. Nonetheless, Kaufman, on cross-examination of Huffine, after asking for a percentage of the families who lived there that had children, asked him, "Is that generally run the way it is?" Tr. p. 200. Huffine responded, "Yes sir." *Id.* at 201. Kaufman then asked Huffine if he considered the business to be an apartment complex. Huffine replied, "No sir, we're just an extended stay hotel. . . ." *Id.*

[16] Based on the evidence presented at trial, it appears that there is some evidence to support the jury's conclusion that the Wood Creek Inn & Suites was operated as a hotel or motel at the time of the offense. Our standard of review prevents us from reweighing the evidence. *Boggs*, 928 N.E.2d at 864. We must examine the record to determine if there is evidence sufficient to support the jury's decision. *Id.* Here, we find that it does.

## II. Evidence of Manufacturing

[17] In order to convict Kaufman of dealing in methamphetamine as a Class A felony, the State was required to prove beyond a reasonable doubt that Kaufman knowingly or intentionally manufactured methamphetamine in, on, or within one thousand feet of a family housing complex. Ind. Code § 35-48-4-1.1(b)(3)(B)(iii). In this issue, he challenges the evidence supporting his conviction that he was engaged in the manufacturing process. Manufacturing is defined by statute in pertinent part as "the production, preparation, propagation, compounding, conversion, or processing of a controlled substance." Ind. Code § 35-48-1-18 (2001). Indiana Code section 35-41-5-1 (1977) defines an attempt as occurring when a person "acting with the culpability required for commission of the crime . . . engages in conduct that constitutes a substantial step toward commission of the crime."

[18] At Kaufman's jury trial, Detective Brock Hensley testified in great detail about the methamphetamine manufacturing process and the items necessary for its production when the one pot method is used. Typically, a one-liter or two-liter bottle is emptied of its contents and dried out. Ammonium nitrate pellets

contained in cold packs are removed from the cold pack and placed in the bottle. Sodium hydroxide or household lye is then placed in the bottle and mixed with the ammonium nitrate pellets. Those ingredients produce an ammonia gas. Pseudoephedrine based cold medicine is ground up and placed in the bottle. An organic solvent such as Coleman camping fuel or starter fluid is placed in the bottle along with any kind of organic salt. Next, a lithium battery is stripped, in most cases by use of pliers, in order to retrieve the piece of silver metal from inside the battery. The piece of silver metal is placed in the bottle. If Coleman camping fuel is used, the water contained in the fuel will spark the piece of metal. Sometimes water is used to start the reaction if another organic solvent is used. At that point the chemical reduction process has started and the methamphetamine lab is rolling.

[19] The reduction breaks down the pseudoephedrine, which is in solid form, and generates methamphetamine oil, which is suspended in the Coleman fuel. The reduction process takes approximately forty-five to sixty minutes to complete. At that point there are two layers of substances in the bottle. The bottom layer contains the unused lye, the cornstarch binding of the pseudoephedrine pills, and the unused ammonium nitrate pellets. The top layer, or liquid layer, contains the Coleman fuel, which has absorbed the methamphetamine oil. A baster or similar object is used to remove the liquid layer for placement in a glass jar.

[20] To return that methamphetamine oil to solid form, some sort of strong acid, such as muriatic acid or sulfuric acid, is mixed with common household soap to

create hydrochloride gas in a twenty-ounce bottle. Airline tubing, such as the kind used for aquariums, extends from a hole in the cap of the twenty-ounce bottle. After the gas is produced, it is put over the methamphetamine oil to return it to solid form. The solid is washed with acetone, which evaporates quickly, in order to clean up the product. Another option is to allow the solid material to dry in coffee filters.

[21]   Evansville Police Sergeant David Barron, who was the supervisor over the joint task force meth suppression unit, testified that upon examining the items found under the bridge, there were "items indicative of meth manufacture," but that "no chemicals had been mixed, we couldn't find or I couldn't find an active reaction vessel where the chemicals had been put together." Tr. pp. 87, 91.

[22]   When asked about items typically used in the methamphetamine manufacturing process, but which were missing from the scene, such as airline tubing, salt, muriatic acid, or any other items used to generate the gas to smoke off the meth oil, both Sergeant Barron and Detective Hensley testified that sometimes people begin the process in one location and complete the process in another location. None of the officers smelled the odor associated with manufacturing methamphetamine at the location under the bridge. The pseudoephedrine pills were missing from the blister packs and no residue from the manufacturing of methamphetamine was found. The mason jar and the twenty-ounce soda bottle were empty and the coffee filters appeared to be unused.

[23] In *Dawson v. State*, 786 N.E.2d 742 (Ind. Ct. App. 2003), *trans. denied*, we reviewed a defendant's conviction of dealing in a controlled substance under Indiana Code section 35-48-4-2 (2001). We discussed two cases handed down by this Court on August 12, 2002, outlining the distinction between what evidence was sufficient to support a conviction of dealing in a controlled substance under Indiana Code section 35-48-4-2 and possession of two or more listed precursors with the intent to manufacture methamphetamine. *See Bush v. State*, 772 N.E.2d 1020 (Ind. Ct. App. 2002), *trans. denied*; *Iddings v. State*, 772 N.E.2d 1006 (Ind. Ct. App. 2002), *trans. denied*. In *Bush*, we held that in order to convict the defendant of dealing in a controlled substance, the manufacturing process does not have to be completed, nor does there have to be actual product recovered. 772 N.E.2d at 1023. In *Iddings*, we determined that the difference between the evidence required to support a conviction of dealing in a controlled substance, and possession of two or more precursors with the intent to manufacture methamphetamine, is "one may be guilty of possessing chemical precursors with intent to manufacture without actually beginning the manufacturing process, whereas the manufacturing process must, at the very least, have been started by a defendant in order to be found guilty of manufacturing methamphetamine." 772 N.E.2d at 1016-17.

[24] Here, there was evidence to establish that certain items used in the methamphetamine manufacturing process were present. The can of starter fluid had been punctured, the blister packs of pseudoephedrine had been emptied, and a cold pack had been disassembled. Lithium batteries had been stripped,

presumably with the pliers found at the scene. Other items necessary for the manufacture of methamphetamine were present under the bridge. However, the State was required to present evidence found at the location of the meth lab site showing Kaufman engaged in the manufacturing process. The only evidence connecting Kaufman consisted of: (1) the receipt from Kaufman's purchase of pseudoephedrine from Walgreens, (2) Kaufman's finger print on the packaging of one of the cold packs, and (3) Kaufman's presence in the parking lot of the Wood Creek Inn & Suites shortly after police officers arrived to follow up on the tip about the meth lab site. Unlike in *Bush* and *Iddings*, the items were not located in Kaufman's residence or in an area under his exclusive control. Instead, they were located under a bridge, and fingerprints from other individuals were also recovered.

[25] The State cited to our opinion *Montgomery v. State*, 22 N.E.3d 768 (Ind. Ct. App. 2014) in its brief. However, after the brief was filed, the Supreme Court granted transfer, vacating the opinion. In that appeal, we considered the sufficiency of the evidence supporting that defendant's conviction of Class B felony dealing in methamphetamine. In *Montgomery*, the State presented evidence that in the two months leading up to his arrest, the defendant had purchased a box of pseudoephedrine every ten days. At the time of Montgomery's arrest he was in possession of a smoking hydrochloride generator, lye, sulfuric acid, two open instant cold packs containing ammonium nitrate, two one-pound containers of salt, a twenty ounce soda bottle with a bi-layer liquid that smelled strongly of ether, several pieces of burnt foil, an open

package of coffee filters, a pipe cutter, and a plastic funnel with white residue. That evidence, in addition to the defendant's attempt to flee from police, was found to be sufficient to support Montgomery's conviction. Our opinion, however, was vacated upon the grant of transfer.

[26] In this case, the evidence supports an inference that someone or a group of people were preparing to manufacture methamphetamine and that many of the required ingredients were located under the bridge. However, the evidence is insufficient to connect Kaufman to the offense of which he was convicted. The jury was given the option to convict Kaufman of attempted dealing in methamphetamine, but did not do so. Therefore, based on the paucity of evidence linking Kaufman to the manufacture of methamphetamine, we find that there is insufficient evidence to support his conviction for that offense.

[27] However, the jury was instructed on the lesser-included offense of Class C felony possession of chemical reagents or precursors with intent to manufacture controlled substances. Ind. Code § 35-48-4-14.5(f) (2006). In order to convict Kaufman of the offense the State was required to prove beyond a reasonable doubt that Kaufman possessed two or more chemical reagents or precursors with the intent to manufacture a controlled substance within one thousand feet of a family housing complex. We have already concluded that the evidence was sufficient to establish that the location of the suspected meth lab site was within 1,000 feet of a family housing complex. Indiana Code section 35-48-4-14.5(a) sets forth which items meet the definition of chemical reagent and precursors, which includes pseudoephedrine and ammonium nitrate.

"Absent an admission by the defendant, intent must be determined from a consideration of the defendant's conduct and the natural and usual consequences thereof." *West v. State*, 805 N.E.2d 909, 915 (Ind. Ct. App. 2004). "The trier of fact must resort to reasonable inferences based upon an examination of the surrounding circumstances to determine whether, from the person's conduct and the natural consequences of what might be expected from that conduct, a showing or inference of the intent to commit that conduct exists." *Id.*

The evidence presented at trial establishes that the Walgreens receipt found under the bridge was from a purchase made by Kaufman. The NPLEx record and surveillance video connect him to that purchase. Further, his finger print was recovered from the packaging of one of the cold packs. Testimony established that ammonium nitrate pellets used in the manufacture of methamphetamines is a component of cold packs. When Kaufman was arrested and the charges were explained to him he stated that he thought the appropriate charge against him should be possession of precursors. Therefore, we conclude that the State presented sufficient evidence that Kaufman possessed two or more precursors with the intent to manufacture methamphetamine within 1,000 feet of a family housing complex.

# Conclusion

Based on the foregoing, we find that there is insufficient evidence to establish that Kaufman committed the offense of Class A felony dealing in

methamphetamine within 1,000 feet of a family housing complex. However, there is sufficient evidence to establish that he committed the lesser-included offense of possession of two or more chemical reagents or precursors with intent to manufacture controlled substances within 1,000 feet of a family housing complex. Therefore, we remand this matter to the trial court to vacate Kaufman's conviction and sentence for dealing in methamphetamine as a Class A felony, and to enter judgment of conviction against Kaufman on one count of possession of two or more chemical reagents or precursors with intent to manufacture methamphetamine within 1,000 feet of a family housing complex as a Class C felony, and to sentence Kaufman accordingly.

[31] Affirmed in part, reversed in part and remanded with instructions.

Bradford, J., and Pyle, J., concur.